ELVIRA R. STRASSER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Strasser v. Commissioner
Docket No. 30007-84.
United States Tax Court
T.C. Memo 1986-579; 1986 Tax Ct. Memo LEXIS 30; 52 T.C.M. (CCH) 1140; T.C.M. (RIA) 86579; December 8, 1986. Elvira R. Strasser, pro se. Lewis R. Mandel, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in petitioner's 1981 Federal income tax of $8,986. After concessions, the issues that we must decide are: 1. Whether petitioner is entitled to a charitable contributions deduction in excess of the amount determined by respondent. 2. Whether petitioner is entitled to damages from alleged improper treatment *32 by respondent. 3. Whether petitioner is entitled to protection from future improper treatment by respondent. 4. Whether respondent's alleged improper treatment of petitioner entitles petitioner to carry her 1981 charitable contributions forward beyond the five-year limit imposed by section 170(d). [1]
5. Whether petitioner is bound by her stipulation that she is entitled to a charitable contribution of $12.50 per page for the 64 pages of papers she donated to the United States in 1981. 6. Whether petitioner is entitled to reimbursement for the expense of the court appearance of one of her witnesses. 7. Whether petitioner is entitled to a new trial to allow her to present additional evidence of the fair market value of the literary rights she donated in 1981. 8. Whether petitioner is entitled to have this Court channel her pleas for relief to the proper forum, if this Court determines that it lacks jurisdiction over her claims. FINDINGS OF FACT Some *33 of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time she filed her petition herein petitioner was a resident of Stony Brook, New York. She timely filed her Federal individual income tax return for 1981. Petitioner is a Doctor of Philosophy and is a Professor of Mathematics at the State University of New York at Stony Brook. She is the widow of David Rapaport, who had been a prominent psychoanalyst prior to his death in 1960. Rapaport left a large volume of writings, two collections of which, his correspondence file and his manuscript file, are relevant to this case. The correspondence file consists of approximately 7,570 pages of correspondence between Rapaport and others, organized in alphabetical files by the first letter of the last name of the person Rapaport was corresponding with. The file consists of both letters received by Rapaport and letters sent by Rapaport and includes, inter alia, correspondence between Rapaport and other prominent psychoanalysts in which psychoanalytic theories are discussed. Approximately fifty percent of the pages contained in *34 the correspondence file are letters sent to Rapaport by others, and many of the copies of the letters in the file sent by Rapaport are unsigned carbon copies. Petitioner did not own the literary rights to letters sent to Rapaport by others. None of Rapaport's letters in the correspondence file have been published. The manuscript file consists of copies of published articles, lecture notes, speeches, book reviews, and successive drafts and revisions of Rapaport's textbooks and papers. The contents of the manuscript file were listed on an inventory and designated items 1 through 239. The first 100 items of the manuscript file contain a total of 4,946 pages. The 4,946 pages include multiple copies of many of the items. Some of the items in the manuscript file have been published. [2]
After Rapaport's death, petitioner began donating his papers to the United States. In 1961, petitioner placed the correspondence file on deposit with the Library of Congress. A document entitled Instrument of Deposit and Dedication signed by petitioner on December 29, 1962, governed *35 the terms of the deposit. The instrument provided that petitioner was depositing the papers in the Library of Congress for a term of not less than ten years and reserved access to the papers for 50 years to (1) herself, (2) persons she, or after her death her daughters, designated in writing, and (3) Dr. Merton M. Gill, an associate of Rapaport's. The instrument additionally reserved for petitioner all literary rights in the papers for her lifetime. The instrument specified that it was also to govern future deposits of papers in the Library of Congress. The instrument declared that petitioner intended to transfer title to the deposited papers to the United States of America in installments, for the benefit of the Library of Congress, by future execution of a deed of gift for each installment. By a document entitled Instrument of Gift dated December 29, 1962, petitioner transferred to the United States title to alphabetical files A-E, F-I, and M-R of the correspondence file, subject to the 50 year restriction on access and the lifetime reservation of literary rights provided in the Instrument of Deposit and Dedication. Petitioner donated the remainder of the correspondence file *36 to the United States in 1966, subject to the same restrictions on access and the same reservation of literary rights. On December 24, 1969, petitioner deposited the manuscript file in the Library of Congress. Petitioner transferred in installments title to the papers in the manuscript file to the United States for inclusion in the collections of the Library of Congress. Each installment was made under the terms of an instrument of gift that reserved for petitioner all literary rights in the papers for her lifetime. [3] Title to the papers in the manuscript file was transferred to the United States as follows: Year
Items Donated
1969
1-29.a4
1970
29.a5-54
1971
55-70
1973
82-91
1974
71-81, 92-100
1975
101-123
1976
124-182
1978
183-207
1980
208-239
During the entire period the correspondence and manuscript files have been held by the Library of Congress, the Library has never received inquiries from persons *37 wishing to purchase or publish them, and has never received requests for copies of them. The materials have been put to only limited use by scholars. The amounts petitioner claimed as charitable contributions for the items donated in 1974 through 1977 were the subject of prior actions in this Court. [4] In one of the prior actions, petitioner and respondent agreed that petitioner would be allowed a charitable contribution of $12.50 per page for the donations she made in 1974-1980. [5] The donations that petitioner made in 1974-1980 did not include petitioner's lifetime interest in the literary rights to the papers. In 1981, petitioner donated to the United States the life interest she had reserved in the literary rights to the 3,785 pages of the correspondence file written by Rapaport and the 4,946 pages of the first 100 items of the manuscript file. Petitioner claimed *38 a charitable contribution of $160,000 from the donation of the literary rights computed at the rate of $16 per page for 10,000 pages. Respondent audited petitioner's 1981 return and determined a deficiency of $8,986 in petitioner's 1981 taxes. The deficiency was based on the following adjustments determined by respondent: Shown on
Allowed by
Item
Return
Respondent
Adjustment
Contributions
$19,670.00
$800.00
($18,870)
Travel & Transportation
Expense
1,005.00
603.00
(402)
Court Fees
4,807.00
1,652.00
(3,155)
Unearned Income
5,708.49
10,987.49
5,279 The adjustment of the contributions resulted from respondent's disallowance of all of petitioner's claimed $1,195 deduction of cash contributions, and $17,675 of petitioner's claimed $18,475 deduction of noncash contributions. [6]
*39 Petitioner timely petitioned this Court to redetermine the deficiency determined by respondent. In her petition filed August 22, 1984, petitioner alleged that respondent erred in (1) disallowing $18,870 of her deductions for charitable contributions, (2) disallowing deductions for her 1981 business travel expenses, (3) imputing to her the additional unearned income, and (4) disallowing deductions for $3,155 of litigation costs incurred by her in connection with her May 1981 Tax Court trial. Petitioner claimed in her petition to be entitled to deduct at least $3,851 of litigation costs from her 1981 income, and sought "protection from eventual financial harm due to an audit protracted by [respondent] beyond all reason." [7] The parties in this case stipulated prior to trial that petitioner did not have the $5,279 of additional unearned income determined by respondent, that the value of 64 pages of Rapaport's papers that petitioner contributed to the United States in 1981 was $800 [12.50 per page] as determined by respondent, and that petitioner was to be allowed an additional contribution of $1,195 for her cash contributions, a total of $2,364.50 of court fees, and a total of *40 $1,005 of travel and transportation expense. In an amended petition, petitioner claimed damages of $1.1 million that she alleges were caused by respondent's improper treatment of her, sought this Court's protection from future improper treatment by respondent, and sought a judgment that respondent's alleged improper treatment entitled her to carry her 1981 charitable contributions forward past the five year limit until deducted. In an amended answer, respondent asserted that petitioner is estopped by the settlement agreed to in docket No. 3304-79 from claiming a charitable contribution deduction for the *41 papers donated from 1974 through 1980. Respondent agreed at trial to allow petitioner to deduct an additional amount of state income taxes provided she verifies that the full amount of withholding reflected on her 1981 W-2 was withheld and was not claimed by her. [8]
ULTIMATE FINDINGS OF FACT 1. Petitioner had reserved a life interest in the literary rights to 8,731 pages of the manuscript and correspondence files that she donated to the United States from 1962 through 1974. [9]
2. Petitioner donated the life interest she had reserved in the literary rights to the 8,731 pages to the United States in 1981. 3. Petitioner's life interest in the literary rights to the 8,731 pages had no ascertainable value. OPINION Charitable Contribution Deduction
The first issue for our *42 decision is whether petitioner is entitled to deduct as a charitable contribution an amount in excess of the amount determined by respondent for her 1981 donation of literary rights to the United States. Section 170 allows an individual a deduction for charitable contributions, subject to percentage limitations, and allows a carry-over of any contributions in excess of those limitations. See sections 170(b) and (d). To establish that she is entitled to deduct an amount in excess of the amount determined by respondent petitioner must prove (1) the identity and quantity of the documents as to which she donated to the United States her literary rights, and (2) the value of the literary rights. We have examined the evidence before us and found that petitioner in 1981 donated to the United States her life estate in the literary rights to 8,731 pages of documents. At issue is the fair market value of that life estate. If a charitable gift is of property other than money, the amount of the contribution *43 is the fair market value of the property as of the date contributed, reduced when necessary as provided in section 170(e)(1). Sec. 1.170A-1(c)(1), Income Tax Regs. The generally accepted definition of fair market value is set forth in respondent's regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. Market demand, or lack thereof, for contributed property is a factor in determining its fair market value. Jarre v. Commissioner,64 T.C. 183, 188 (1975). The use to which donated property will be put is also a factor in determining value. Guggenheim v. Rasquin,312 U.S. 254, 257 (1941). The absence of an established market price does not necessarily prevent property from being valued. Guggenheim v. Rasquin,supra at 258. A charitable contribution deduction will be denied, however, where it has not been proven that donated property had any value. Goodman v. Commissioner,T.C. Memo. 1970-122. *44 The fair market value of property as of any given date is, in sum, a question of fact to be resolved by considering and weighing all relevant evidence in the record. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Respondent's determination in his notice of deficiency of the fair market value of the contributed property is presumptively correct, and the burden of proving a higher fair market value rests on petitioner. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In the present case expert witnesses testified on behalf of both petitioner and respondent. The opinions of experts are admissible and relevant to the issue of value, but the opinions must be weighed in light of each expert's qualifications and all other relevant evidence of value. Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). Petitioner relies on an appraisal performed by Dr. Jason Aronson to establish that the fair market *45 value of the literary rights donated in 1981 exceeded the amount determined by respondent. [10] Aronson is a psychiatrist and a psychoanalyst, and had been president of Jason Aronson Inc., a publisher of books on the subject of psychiatry and psychoanalysis, for 20 years. He was familiar with Rapaport and Rapaport's contributions to the fields of psychiatry and psychoanalysis. Aronson never went to the Library of Congress to view the papers that had been donated by petitioner. He based his appraisal of the correspondence file on his examination of copies of approximately 50 letters that had been extracted from the correspondence file by petitioner, and on petitioner's representation to him that they were typical of the contents of the file. He based *46 his appraisal of the manuscript file on his review of the inventory that listed the items contained in the file. Aronson admitted that his expertise was limited to the value of one-time rights to reprint published materials, and that he had no experience valuing the literary rights to unpublished materials. Despite his admitted lack of expertise in this area, Aronson appraised the literary rights to the correspondence at $45 per page, and to the manuscript file at $40 per page, based on his opinion of the 1981 cost of reprinting already published material. Aronson's appraisal did not indicate that he considered two factors relevant to the value of the literary rights: (1) that petitioner had only a life interest in the literary rights, and (2) that there was a lack of demand for access to the papers. Respondent countered Aronson's appraisal, and supported his own determination, with the expert testimony of William H. Mobley. Mobley holds masters degrees in both library science and history. He had been employed by the Library of Congress for 21 years when he testified, and had been the Library's principal evaluations officer for four years. As the principal evaluations officer, *47 he was responsible for establishing monetary values for all types of materials, including manuscripts and materials for which there are no established markets. His position required him to be familiar with (1) the contents of the Library's special collections, (2) the organization and specialities of dealers in library materials, (3) the market value of all types of library materials and the methods for ascertaining them, and (4) the factors affecting the past and present market value of library materials. In a typical year, he valued between 75 and 85 gifts with a total value of over $2 million, including materials loaned to the Library for insurance purposes, surplus materials that the Library was considering disposing of, and materials the Library was considering purchasing. Mobley examined the actual papers of both the correspondence file and the manuscript file on several occasions. He concluded that they were not salable on the open market, and determined that they were valuable for research purposes only. He was aware of the lack of demand for the papers: he testified that, in the entire period the papers had been held by the Library of Congress, the Library had never *48 received inquiries from persons wishing to purchase or publish them, had never, to his knowledge, received requests for copies of the materials, and that the materials have been put to only limited use by scholars. He was not aware that the literary rights to the papers had any value. We find Mobley's assessment of the literary value of the documents to be more realistic than Aronson's. Mobley valued the literary rights to the documents after physically examining them. Aronson valued the literary rights to the documents after examining only the small sample of them that petitioner had assembled for the specific purpose of obtaining an appraisal. Mobley's position at the Library of Congress required him to value manuscripts and materials for which there are no established markets. Aronson admitted that he had no experience valuing the literary rights to unpublished materials, which made up the correspondence file and much of the manuscript file. Mobley was aware of the fact there had been no demand for the materials. Aronson was unaware of the demand for the materials. Fair market value must be measured in terms of the cash price realizable. See, e.g., Willow Terrace Development Co. v. Commissiner,345 F.2d 933, 936 (5th Cir. 1965), *49 affg. 40 T.C. 689 (1963), cert. denied 382 U.S. 938 (1965); Kaplan v. United States,279 F. Supp. 709, 711 (D. Ariz. 1967). Petitioner has not met her burden of proof and demonstrated that the cash price realizable for her life estate in the literary rights exceeded the amount determined by respondent, which was zero. We hold that respondent's determination of the fair market value of petitioner's life interest in the literary rights that she donated to the United States of America has not been shown to be in error. [11]
As we have held that petitioner has not shown that respondent erroneously determined that *50 her life interest in the literary rights was worthless, we need not address respondent's arguments that petitioner is equitably estopped by the settlement agreed to by petitioner in docket No. 3304-79 from claiming deductions for the literary rights and that petitioner failed to meet the substantiation requirements of section 170(a)(1) and section 1.170A-13(d)(2), Income Tax Regs.
Another component of petitioner's 1981 charitable contribution that respondent disallowed was the claimed carry-over of $3,462.50 of charitable contributions from 1980. Petitioner failed to present any evidence that she made charitable contributions in years prior to 1981 that entitled her to a carry-over to 1981. We accordingly hold that petitioner has not proven that she is entitled to the carry-over. Improper Treatment
Petitioner argues that respondent's alleged improper treatment of her entitles her (a) to damages, (b) to protection, and (c) to carry-forward her 1981 charitable contributions beyond the five year limit on carry-overs until deducted. We will discuss each issue in succession. (a) Petitioner asserts that she is entitled to $1.1 million damages *51 based on alleged improper treatment by respondent. According to her reply brief, those damages would compensate her for the time respondent's alleged improper treatment forced her to devote to tax matters since Rapaport's death in 1960. The damages allegedly represent her lost earnings for the time she devoted to tax matters. Regardless of the merits of her claim, or the lack thereof, this Court lacks jurisdiction to award her damages. The Tax Court is a court of limited jurisdiction. Medeiros v. Commissioner,77 T.C. 1255, 1259 (1981). Our jurisdiction is granted to us by section 7442, and is limited to jurisdiction to redetermine deficiencies in Federal income, estate, gift, and specified excise taxes, and to hear declaratory judgment and disclosure actions where specifically permitted by statute. See secs. 6214, 6110(f), 7428, 7476, 7478. [12] We have not been granted jurisdiction to award damages against respondent for treating petitioner "improperly." Cf. Flynn v. Commissioner,40 T.C. 770, 773 (1963); but see and compare section 7430. We accordingly *52 deny petitioner's request for damages. (b) In her petition, petitioner sought "protection from eventual financial harm due to an audit protracted by [respondent] beyond all reason." As petitioner did not consider this issue in either her original or reply briefs, we consider it to have been conceded. [13]
*53 (c) In an amended petition, petitioner sought a judgment that respondent's alleged improper treatment entitled her to carry her 1981 charitable contributions forward past the five year limit imposed by section 170(d)(1) until deducted. Petitioner claims that the harassment and pressure caused by the alleged improper treatment coerced her into making a larger donation in 1981 than she would have otherwise. We have sustained respondent's determination of the value of petitioner's charitable contribution of literary rights, and it is therefore unnecessary for us to decide this issue as no carry-forward results from her 1981 charitable contributions. [14]
*54 Petitioner's Stipulation
In her reply brief, petitioner requested that this Court strike her stipulation that the 64 pages of Rapaport's papers that she contributed to the United States in 1981 had a value of $12.50 per page, and allow her the $32 per page value she claimed in her return. The terms of stipulations are generally binding on the parties. Rule 91(e). Although this Court has authority to disregard a stipulation that is clearly contrary to the facts, Jasionowski v. Commissioner,66 T.C. 312, 318 (1976), the facts here do not clearly demonstrate that the value of the papers exceeded $12.50 per page. [15] We accordingly deny petitioner's request.
Reimbursement of Expense
In her reply brief, petitioner requested *55 that this Court award her the expenses of the appearance of one of her witnesses. This Court has the authority to award reasonable litigation costs to prevailing taxpayers. Sec. 7430. To be entitled to an award, petitioner must establish both that she was the prevailing party, and that she exhausted her administrative remedies within the Internal Revenue Service before filing her petition. Sec. 7430(a) and (b). In unagreed cases such as the case before us, claims for litigation costs are properly made only after service of this Court's written opinion deciding the case. Rule 231(a)(2). We accordingly deny petitioner's request for an award of costs as her request is untimely. New Trial
Petitioner requested in her brief that she be granted a new trial to present further evidence of the value of the literary rights she donated in 1981 should this Court find fault with the values determined by her expert witness. [16]A request for further trial to present additional evidence will be granted *56 only upon a showing of exceptional circumstances, and will not be warranted unless petitioner can show affirmatively that her failure to present the evidence at the original trial was not due to any lack of diligence on her part. Selwyn Operating Corp. v. Commissioner,11 B.T.A. 593, 594-595 (1928). Petitioner has not demonstrated that her failure to present further evidence was not due to her lack of diligence. Her brief instead indicates that she simply wishes to present evidence of value that she failed to introduce at trial. We accordingly deny petitioner's request for a new trial to present further evidence. Other Relief Requested
Petitioner requested in her brief that this Court channel her requests for relief *57 to the proper forums. The jurisdiction granted to us by section 7442 does not include the power to transfer causes of action to other courts. Petitioner is responsible for selecting the proper forum in which to present her claims. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The record is insufficient to allow us to determine which items of the manuscript file have been published.↩
3. By letter dated November 12, 1975, petitioner removed the restrictions on access↩ to papers she had donated to the United States. Donated papers remained subject, however, to petitioner's lifetime reservation of literary rights.
4. Petitioner had previously filed two petitions with this Court, docket Nos. 3304-79 and 8611-81 on March 15, 1979 and April 20, 1981, respectively. Docket No. 3304-79 involved taxable years 1974, 1975, and 1976. Docket No. 8611-81 involved taxable year 1977. ↩
5. The settlement occurred in docket No. 3304-79.↩
6. In 1981 petitioner claimed cash charitable contributions of $1,195, noncash charitable contributions of $162,048, and a carry-over of charitable contributions to 1981 from 1980 of $3,462.50. The $162,048 of noncash charitable contributions consisted of $160,000 ($10 per page) claimed for the contribution of the literary rights to papers of the correspondence and manuscript files, and $2,048 ($32 per page) claimed for 64 pages of manuscript donated to the United States in 1981. Petitioner limited her gross contribution deduction to $19,670, 50 percent of the $39,339.97 adjusted gross income she reported. Of the charitable contributions claimed by petitioner, respondent allowed only $800, consisting of the 64 pages of manuscript at $12.50 per page. Respondent disallowed all of the carry-over from 1980, and all of the amount claimed for the literary rights.↩
7. After filing her petition in this case, but before the parties executed their stipulation of facts and amended their petitioner and answer, petitioner filed an amended individual income tax return for 1981 on which she purported to report a page count of the papers that she donated to the United States the literary rights to in 1981. Petitioner reported on the amended return that the page court of the correspondence file was 14,000 pages, computed at the rate of 1,000 pages per foot times 18 feet of shelf space, and that work papers numbers 49 to 100 totaled 2,518 pages.↩
8. Petitioner's 1981 form W-2 indicated that her employer withheld $1,113.41 of New York taxes from her wages. Petitioner deducted only $194.36 of state and local income taxes from her 1981 return, however.↩
9. The 8,731 pages consisted of the 3,785 pages of correspondence written by Rapaport from the correspondence file, and 4,946 pages from items 1 through 100 of the manuscript file.↩
10. Petitioner attempted to qualify John Gach as an expert witness. The Court refused to accept Gach as an expert witness, as petitioner had not notified respondent before trial that Gach would be called as an expert. Rule 143(f). Gach's opinion would not have been persuasive had he been allowed to express it, as he stated that he had never valued the literary rights at issue, and that he was in any event unqualified to do so.↩
11. We recognize that this holding results in a significant financial defeat for petitioner. We direct to her attention our decision in Buffalo Tool & Die Manufacturing Co. v. Commissioner,74 T.C. 441, 452↩ (1980). We cautioned in that opinion that our decisions regarding the fair market value of property may result in significant financial setbacks particularly, as here, when we find the evidence of value presented by one party to be substantially more convincing than that presented by the other party.
12. The Commissioner has broad discretion to audit returns, provided he has a legitimate reason for doing so. Silvey v. Commissioner,T.C. Memo. 1976-401. An examination is not unnecessary if the Commissioner needs information that is not in his possession to determine a taxpayer's income tax liability. See United States v. Powell, 379 U.S. 48, 53 (1964). The Commissioner is entitled to audit a return to examine a deduction that he examined and allowed when claimed in previous years. Chapman v. Commissioner,T.C. Memo. 1982-68↩.
13. Rule 151(e). See Stonegate of Blacksburg, Inc. v. Commissioner,T.C. Memo. 1974-213 (holding issue of deductibility of travel expenses conceded when not considered in original or reply briefs). See also Calcutt v. Commissioner,84 T.C. 716, 721-722↩ (1985).
14. We note, however, that the Internal Revenue Code, not general equitable principles, is the source of this Court's jurisdiction. Commissioner v. Gooch Milling & Elevator Co.,320 U.S. 418, 422 (1943). Petitioner's request is essentially a plea for equitable relief. We have no authority to grant equitable relief from the tax statutes in situations such as this. Pesch v. Commissioner,78 T.C. 100, 130-131 (1982); Estate of Rosenberg v. Commissioner,73 T.C. 1014, 1017↩ (1980).
15. Valuation of the papers is a factual issue, to be determined by considering and weighing all relevant evidence in the record. See Kaplan v. Commissioner,43 T.C. 663, 665↩ (1965). The parties failed to produce at trial evidence of the fair market value of the papers as they had stipulated the value before trial.
16. The proper method of requesting an opportunity to present further evidence of the fair market value of the literary rights is to file a motion for reconsideration of findings of fact, and to request further trial to allow the presentation of additional evidence. Rule 161. We decide petitioner's request for a new trial in this opinion in the interest of bringing this case to a just, speedy, and inexpensive conclusion. Rule 1(b).↩