FREDERICK C. JOHNSON AND JUDITH A. JOHNSON, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26253–83.    Filed September 17, 1985.

*Arthur H. Boetler*, for the petitioners.
*Wayne Appleman*, for the respondent.

HAMBLEN, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency |
| --- | --- |
| 1976 | $8,195 |
| 1977 | 17,217 |
| 1978 | 152 |

The issues in this case are the fair market value of certain Indian artifacts[1] and etchings donated to the Museum of Native American Cultures (MONAC)[2] and the application of section 6621(d)[3] as to interest on substantial underpayments attributable to tax motivated transactions.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners resided in Bellevue, Washington, when they filed their petition in this case.

Petitioner Frederick Johnson (Frederick) was a contractor. Petitioner Judith Johnson (Judy) was a homemaker and part-time purveyor of art and antiques.

Petitioners began to collect art and antiques in 1970, and Judy took art history courses during 1976. During the years in issue, however, petitioners' level of art sophistication approximated only that of hobbyists.

Petitioners became friendly with Patsy Converse Bates (Bates) in March of 1976. Bates operated the Converse Galler-

---

[1]The petitioners purchased a collection of 143 baskets and 2 model canoes. They donated 130 baskets and 2 model canoes. We refer hereinafter to the above in the aggregate as artifacts.

[2]The Museum of Native American Cultures is also known as the Pacific Northwest Indian Center, Inc.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

ies, where she performed as a dealer and appraiser of art and antiques.

Bates introduced petitioners to Wilfred Schoenberg (Schoenberg) in May of 1976. Schoenberg had founded MONAC in December of 1965. During the years 1976 and 1977, he served MONAC as president, chairman, and curator. Schoenberg was intimately involved in the encouragement of donations to MONAC.

MONAC published a brochure to inform potential investors of a special service which it provided. MONAC represented in the brochure that it could locate special bargains of Indian art objects for potential donors. Upon request, MONAC would arrange to deliver the purchased items to potential donors or provide storage for the appropriate capital gain holding period. Additionally, MONAC unilaterally would provide at least two appraisals of the art objects as well as other necessary documentation related to substantiation for tax purposes. MONAC maintained a list of 10 to 12 experts who would provide appraisals of such donated items at no cost. These experts often were "friends" or "associates" of MONAC.

In June of 1976, and following the procedures outlined in the MONAC brochure, Schoenberg located certain artifacts in the gallery of Paul Masa (Masa), an experienced dealer of Indian artifacts. Masa had paid $9,000 for the artifacts less than 1 year prior to his sale of the artifacts to petitioners. Petitioners purchased the artifacts on June 28, 1976. In arranging the transaction, petitioners never discussed their purchase with Masa. Schoenberg delivered the artifacts to petitioners for inspection. Upon inspection, petitioners paid Masa $12,000 for the artifacts by personal check.

Prior to petitioners' purchase of the artifacts, Schoenberg prepared two valuation lists of the artifacts. One list contained 145 artifacts valued at $40,385. The other list contained 144 artifacts valued at $48,805. Schoenberg offered no explanation as to the divergent valuations. Petitioners received the lists from Schoenberg about the time he delivered the artifacts to them for inspection. According to Schoenberg, he had prepared both lists to serve as estimates for insurance purposes. However, there is no indication in the record that petitioners ever insured the artifacts.

Petitioners donated 132 artifacts to MONAC in December of 1976. As outlined in the brochure, MONAC secured two appraisals of the donation as follows:

| Appraiser | Appraisal | Date |
|---|---|---|
| Tom Fitzgerald (Fitzgerald) | $50,705 | 1/25/77 |
| Bates | 63,845 | 1/22/77 |

Petitioners adopted the Bates appraisal and valued the contribution at $63,845 on their 1976 tax return.

Petitioners purchased 500 etchings by Ace Powell from Masa in February of 1977. They paid Masa $5,000 for the etchings. The basis of Masa in these etchings was approximately $3,700. Schoenberg was not an agent in the transaction.

In March of 1977, Judy began employment with Bates at Converse Galleries. Judy's job was to sell art and antiques. In her employee capacity, Judy drafted a letter to a potential investor which detailed items available for a "tax write-off" and represented that the items "should appraise out" at specific values which averaged in excess of 4 times investor cost. Judy left this employment in January of 1978 because she questioned the moral values of Bates. In November of 1981, Bates was found guilty of attempted theft in the first degree concerning a fraudulent insurance claim. The matter of the Bates conviction was not related in any manner to petitioners.

Petitioners donated 194 of the Powell etchings to MONAC in February of 1977. They claimed a deduction for the contribution of the etchings in an amount of $13,975 on their 1977 Federal income tax return. MONAC had provided two appraisals of the Powell etchings. In February of 1978, petitioners had Bates prepare a third appraisal. Bates appraised the etchings in an amount of $13,975, which was in excess of both appraisals furnished by MONAC and which petitioners deducted on their 1977 tax return. Petitioners used the Bates appraisal as the basis of this contribution deduction on their 1977 tax return, notwithstanding that Judy had left the employment of Bates in January of 1978 because she questioned Bates' moral character.

In the notice of deficiency, respondent determined that the fair market values of the donated items were:

| | |
|---|---|
| Artifacts | $19,618 |
| Etchings | 5,000 |

## Expert Valuations

### Michael Johnson

One of petitioners' experts is Michael Johnson (Johnson), who operated an art gallery in Seattle, Washington, for a period of 12 years. The gallery emphasized American Indian art. Johnson closed the gallery in 1980. However, he actively continued in business as a private dealer and appraiser of American Indian art.

Johnson stated that Indian art prices soared during the mid-1970's, in general, and during 1976, in particular. He estimated the average annual appreciation rate to be 20 percent during that period.

Johnson valued the artifacts collection at $35,150. Johnson concluded that the artifacts were, in general, of average to slightly below average quality. He did not view the artifact collection. His valuation was based on photographs and descriptions supplied by petitioners. He indicated that the photographs were not particularly helpful due to poor photocopying quality. Therefore, he relied primarily on the descriptions. Johnson did not value each artifact on an individual basis. Instead he grouped the artifacts according to tribal association. Sotheby Parke Bernet (Sotheby) catalogs for the years 1979, 1980, 1981, and 1982 were used to determine a price range for each tribal group. Johnson then multiplied the number of artifacts in each tribal group by a single price within the range which he determined to be representative of the entire group.

### Walter Crawford

Another of petitioners' experts is Walter Crawford (Crawford), who has had extensive experience concerning American Indian items due to varied involvement since 1926. His primary experience has been that of a dealer of Indian items, including pottery, textiles, and jewelry. Additionally, he has been an appraiser of such Indian items for 30 years.

Crawford did not view any of the items in issue. He determined a valuation based on the photographs and descriptions supplied by petitioners. At trial, he was not sure whether

the descriptions were provided by petitioners. Although Crawford was aided by an assistant in the preparation of his report, the assistant did not sign the report or testify at trial.

Crawford indicated that an appraisal was not possible for 41 artifacts because petitioners had supplied unclear photocopied photographs. In these instances, he provided an estimated value rather than an appraised value.

Crawford valued the artifact collection at $48,420. He valued each item on an individual basis. He researched public auction catalogs and sales records of other dealers of similar items. Crawford attached to his report three catalogs from public auctions held in years 1979, 1980, and 1981.

Crawford has, in the past, performed several appraisals for MONAC at no expense. He first met Schoenberg in 1974, at which time he donated a collection of items of the Northwest to MONAC. Crawford has remained a frequent benefactor of MONAC.

*Richard Cleland*

Respondent's expert, Richard Cleland (Cleland), owned an art gallery in Scottsdale, Arizona. He had been in the business for 13 years. His gallery was of primary interest to collectors, and featured Indian baskets and Indian textiles, as well as Spanish colonial furniture.

Cleland concluded that the artifacts were of average to poor quality, of the type sold to tourists. He indicated that the artifacts, as a group, did not exhibit the depth and breath of style, design, or total origin necessary to enhance them as a study collection.

Cleland traveled to MONAC to view the artifact collection. He was able, however, to view only 19 of the 132 donated artifacts as MONAC typically sold donated items to generate funds. Cleland was not surprised by the absence of the artifacts. MONAC did not maintain business records of the sales.

Cleland appraised the 19 artifacts which he viewed at MONAC. He referred to public auction catalogs, including Sotheby's, as well as sales of his own gallery and other dealers.

With reservations, Cleland found the descriptions adequate to provide an estimated value, not an appraised value, for an additional 72 artifacts. He concluded that the descriptions

were inadequate to provide even an estimate of the remaining 41 items. Cleland did not have the photographs.

Respondent adopted Cleland's value as to the 19 artifacts appraised, and the 72 artifacts estimated. Respondent determined an allocated value for the remaining items. The valuations may be summarized as follows:

| | |
|---|---|
| 19 Appraised by Cleland | $1,650 |
| 72 Estimated by Cleland | 10,040 |
| 41 Allocated value by respondent | 7,928 |
| Total artifact value by respondent | 19,618 |

## Herbert Hoover

Herbert Hoover (Hoover) owned an art gallery in San Francisco, California. He specialized in 19th and 20th century paintings and was a senior member of the American Society of Appraisers.[4]

Hoover appraised the donated Ace Powell etchings for respondent at $4,925, as of the date of donation. He researched auction records and consulted private galleries. He found little evidence of comparable sales. He indicated that lesser works of Ace Powell, such as those in issue, had a limited market and were not handled by most auction houses and private galleries.

### OPINION

There is no dispute in this case that an actual donation was made to a qualified charitable donee under section 170(c). The only controversy before us is the fair market value of the art items which constitute the donation. The fair market value is the amount petitioners may deduct as a consequence of the contribution. In this respect, respondent's determination of fair market value is presumptively correct, and petitioners bear the burden of disproving that determination. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a).

Section 1.170A–1(c)(1), Income Tax. Regs., provides that the amount of a charitable contribution made in property other than money shall be the fair market value of the property on

---

[4]Petitioners' expert Monahan did not testify at trial. His report was not entered into the record. The parties stipulated that the Monahan report would have determined a value substantially the same as respondent's expert Hoover.

the date of donation, reduced as provided in section 170(e)(1).[5] Section 1.170A–1(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. See *United States v. Cartwright*, 411 U.S. 546, 549 (1973). As reflected in petitioners' Federal income tax returns for the years 1976 and 1977 and the notice of deficiency issued by respondent, the parties take extremely divergent positions as to the fair market values of the donated items.

At the outset, we think certain observations are pertinent. We previously have made clear that the settlement process is more conducive to the proper disposition of disputes such as this because a valuation "is inherently imprecise and capable of resolution only by a Solomon-like pronouncement." See *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980); *Messing v. Commissioner*, 48 T.C. 502, 512 (1967). At trial, the Court referred the parties to our comments in *Buffalo Tool & Die Mfg. Co.* where we admonished that in litigated valuation cases:

the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. * * * We do not intend to avoid our responsibilities but instead seek to administer to them more efficiently—a factor which has become increasingly important in light of the constantly expanding workload of the Court. [*Buffalo Tool & Die Mfg. Co. v. Commissioner, supra* at 452.]

Accordingly, we urged counsel for both parties that settlement, rather than trial, might be a more efficacious means to dispose of this case. As the parties did not heed our urging, we must determine the fair market value of the items in issue as of the date of donation.

*Indian Artifacts*

Petitioners submit that the purchase of 145 Indian artifacts from Masa in June of 1976 was a bargain purchase significant-

---

[5] No reduction under sec. 170(e) was required since petitioners satisfied the appropriate holding period concerning the donation of Indian artifacts in 1976 and the etchings in 1977.

ly below fair market value. Furthermore, petitioners assert that the market for Indian artifacts soared during 1976.

Respondent asserts that petitioners and Schoenberg participated in a scheme which was designed to achieve excessive valuations of property donated to MONAC. Furthermore, respondent argues that the valuations within the notice of deficiency are correct, if not in fact generous valuations of the artifacts. We agree.

Petitioners purchased the 145 artifacts from Masa in June of 1976. Schoenberg, acting as their agent, negotiated a purchase price of $12,000. Masa had acquired the artifacts for $9,000 and sold them to petitioners within a year of their purchase. Masa was an experienced dealer who operated out of his home. His practice was to achieve a high rate of inventory turnover. As to these artifacts, Masa turned over his inventory and outperformed the average annual rate of return as estimated by petitioners' expert Johnson. We find no evidence that Masa was forced to sell at distressed prices. Indeed, these artifacts were sold in the normal course of his business and returned an above-average yield. We conclude that petitioners' purchase price of the 145 artifacts reflected their fair market value at that time. We now must determine fair market value of the 132 artifacts donated to MONAC in December of 1976.

As before noted, petitioners bear the burden of proof as to the valuation determinations in the notice of deficiency. *Welch v. Helvering*, 290 U.S. 111 (1933). Rule 142(a). Although we may rely on qualified, expert-opinion evidence, we must weigh such evidence in light of not only the demonstrated qualifications of the experts but all other pertinent circumstances and evidence of value. *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court.

Respondent, in his determination, relied on Cleland's report. Cleland was a credible witness and impressed us as being the most objective of all of the experts who testified concerning the artifact values. We rely heavily on the probative value of his visual examination.

Johnson and Crawford relied on the descriptions because of the inadequacy of the photographic evidence. Reliance on photographs is not unusual in the appraisal of art.[6] Indeed,

---

[6]*Gordon v. Commissioner*, T.C. Memo. 1976–274; *Posner v. Commissioner*, T.C. Memo. 1976–216.

photographs generally serve as the basis for appraisals by the Art Advisory Panel to the Internal Revenue Service. Here, however, petitioners failed to supply Johnson and Crawford with reliable photographic evidence. Consequently, we do not accept the values determined by Johnson and Crawford, as their values were based primarily on the descriptions drafted by Schoenberg without the benefit of independent and reliable visual examination. Although Cleland viewed only 19 artifacts, we are persuaded that at least some objective visual inspection was essential to determine an accurate value. Considering the values asserted, we find it incredible that petitioners failed to provide reliable photographic evidence. We find it equally incredible that a mere 19 artifacts were retained and made available by MONAC for inspection. It is unfortunate and somewhat suspect that MONAC did not maintain business records of the subsequent sales of the donated artifacts, as such records would certainly have provided persuasive evidence of value. Furthermore, we note certain other defects in the Johnson and Crawford reports.

The critical date of valuation was the date of donation, December of 1976. Sec. 1.170A–1(c)(2), Income Tax Regs. The Johnson and Crawford reports confused the issue by reference to catalogs of inappropriate years. Johnson used auction catalogs from Sotheby's to determine a price range for each of his tribal groupings.[7] The catalogs were from the years 1979, 1980, 1981, and 1982. Crawford attached public auction catalogs for the years 1979, 1980, and 1981 to his report so as to provide evidence of comparable sales. We find that neither report was prepared to clearly reflect fair market value as of the date of donation, December of 1976.

Johnson employed a group method of valuation. He grouped artifacts according to tribal association. Clearly, the artifacts

---

[7]Valuation opinion reports by qualified experts necessarily employ an imprecise method to determine fair market value. Typically, appraisers research sales of comparable items at major auction houses to provide reliable and objective evidence of value. We take judicial notice of the apparent increase of consumer complaints regarding some auction house practices, including a highly publicized civil lawsuit brought against Sotheby's last year by the New York State Attorney General's Office concerning the 1984 auction of rare Judaica. Additionally, the New York City Department of Consumer Affairs, which licenses auction houses, is currently investigating such auction practices. The existence of deceptive trade practices by major auction houses would cast a shadow as to the reliability and objectivity of opinion reports which rely on published sales data from such auction houses. The New York Times, July 31, 1985, at A1, col. 4; The Economist, July 27, 1985, at 16.

were of varied quality and value. His method failed to demonstrate the degree of particularity necessary to assist in our determination of value.

Crawford was aided by an assistant in the preparation of his report, although his assistant did not sign the report or testify about it. At trial, Crawford was unsure as to whether or not descriptions were provided by petitioners or drafted by his assistant. In fact, the decriptions within his report were identical to those supplied by petitioners. Due to inadequate visual evidence, Crawford based his report on these descriptions. It is our view, therefore, that Crawford was not competent to testify as to all aspects of his report.

Petitioners argue that as collectors, they were able to purchase the artifacts at a price substantially below fair market value. We have found no evidence in the record to support this contention. In fact, petitioners purchased the artifacts from an experienced dealer who received an above-average rate of return. Petitioners were hobbyists, with an interest in art, who relied on Schoenberg to effectuate all aspects of the subject purchases. The Schoenberg valuations were provided prior to purchase. This certainly implied that a subsequent donation to MONAC would be appraised at a value far in excess of cost. It is our belief that petitioners purchased the artifacts with a clear intent to donate them to MONAC and with some assurance that subsequent donations to MONAC would be appraised at values far in excess of their cost. Indeed, MONAC secured the Fitzgerald and Bates appraisals of the donated artifacts. These appraisals were higher than Schoenberg's valuations of the entire collection, even though the record indicates that the artifacts which were not donated to MONAC were some of the better items in the collection.[8]

---

[8]We note the recent legislative "qualified appraiser" regulations mandated by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 155, 98 Stat. 494, 691, and issued as temporary and proposed regulations. Sec. 1.170A–13T(c), Temporary Income Tax Regs. The new substantiation requirements of sec. 170 and regulations thereunder apply to returns filed after Dec. 31, 1984. We note these new requirements because they are illustrative of congressional concern of tax shelter promotions which exploit the deductibility of appreciation in capital gain assets and other situations of gross overvaluations of donated property. The pertinent "qualified appraiser" language, pointedly directed to the situation here, reads as follows:

(c) *Deductions in excess of $5,000 for certain charitable contributions of property made after December 31, 1984—*

\*　　\*　　\*　　\*　　\*　　\*　　\*

Additionally, Fitzgerald and Bates were on MONAC's list of appraisers who routinely provided their services to MONAC on a gratuitous basis. Given the circumstances of the instant case, we conclude that their appraisals were not prepared on an independent basis. The artifacts were of average quality at best. Indeed, MONAC retained a mere 19 of the 132 donated artifacts. We are astonished that petitioners could produce no evidence of value received by MONAC from subsequent sales of the donated artifacts.

We agree with respondent's determination that fair market value of the artifacts during December of 1976 was $19,618. This determination of value provides an appreciation rate far in excess of the average annual rate of 20 percent as testified by petitioners' expert Johnson. Petitioners' basis in the artifact collection was $12,000. We have previously determined that petitioners did not receive a bargain purchase of the artifact collection from Masa. Petitioners donated to MONAC 132 of the 145 artifacts which they purchased from Masa. The pro rata basis of the donated artifacts approximates $11,000.[9] Thus, the rate of return provided by our determination of

---

(5) *Qualified appraiser*—(i) *In general.* The term "qualified appraiser" means an individual (other than a person described in pargraph (c)(5)(iv) of this section) * * *

(ii) *Exception.* An individual is not a qualified appraiser * * * if the donor had knowledge of facts which would cause a reasonable person to expect the appraiser falsely to overstate the value of donated property (e.g., where an agreement is made between the donor and the appraiser concerning the amount at which the property would be valued and such amount exceeds the fair market value of the property).

        *      *      *      *      *      *      *

(iv) *Qualified appraiser exclusions.* The following persons cannot be qualified appraisers with respect to particular property:

        *      *      *      *      *      *      *

(C) The donee of the property.

        *      *      *      *      *      *      *

(E) Any person whose relationship to any of the persons listed in paragraph (c)(5)(iv)(A) through (D) of this section would cause a reasonable person to question the independence of such appraiser. * * *

[Sec. 1.170A–13T(c), Temporary Income Tax Regs.]

[9]We note that the record indicates that petitioners did not donate some of the better artifacts. Thus a pro rata valuation of basis assigns a higher basis to the donated artifacts than the donated artifacts actually warranted.

value exceeds 78 percent.[10] Assuming, arguendo, petitioners' assertion that Indian artifacts experienced tremendous appreciation during 1976, we find that our determination of value generously accounts for any such appreciation.

Petitioners have totally failed to satisfy their burden of proof. Furthermore, we agree with respondent that a pattern of abuse existed. The facts indicate that Schoenberg was overzealous in his effort to benefit MONAC, and that the Bates appraisal was not prepared on an independent basis. Petitioners should have been aware that the Bates valuation was grossly excessive, particularly given their asserted expertise in Indian art. Petitioners would have been well advised to have heeded a Wall Street maxim concerning propitious market conditions, that "You can make money being a bull and you can make money being a bear, but you can't make money being a pig."[11]

Petitioners assertion of the Bates appraisal on their 1976 tax return was gluttonous.

*Etchings*

Petitioners purchased 500 etchings by Ace Powell from Masa in February of 1977 for $5,000.[12] Schoenberg was not petitioners' agent in this transaction.

In December of 1977, petitioners donated 194 of their etchings to MONAC and claimed a charitable deduction of $13,975 on their 1977 tax return. Bates provided the appraisal. In March of 1977, Judy commenced employment as a salesperson with Bates at Converse Galleries. During October of 1977, Judy wrote a letter to a potential investor. The letter identified "a few items available for a tax write-off" and represented that each item would "appraise out" at a value between 4 and 5 times investor cost. The obvious message of this sales pitch is that items available for purchase through Converse Galleries would yield a deduction for tax purposes in excess of 4 times investment if donated to a charitable institution. She also informed the potential investor of Schoenberg's active participation in locating additional items for contribution to MONAC

[10]Net appreciation ($19,618–$11,000) ................................. $8,618
    Allocated basis ....................................................... 11,000 = 78.35% rate of return
[11]Eustice & Lyons, "Federal Income Taxation," 36 N.Y.U. L. Rev. 642, 651 (1961).
[12]For a recent opinion involving contributions by taxpayers of works by Ace Powell, see *Harken v. Commissioner*, T.C. Memo. 1985–468.

in the event that the identified items were no longer available. In our view, the letter indicates that Judy was keenly aware of the tax benefits associated with charitable giving and the correlative importance of appraisals in the substantiation of charitable deductions. Judy left this employment in January of 1978 because she questioned the moral values of Bates. However, Bates appraised the 194 etchings in February of 1978 and petitioners adopted her appraisal on their 1977 tax return. Although Judy was of the opinion that Bates was not of good moral character and that she could not in good conscience continue employment with Bates, petitioners had sufficient confidence in Bates' character to adopt her valuation. This is inconsistency to the point of being ludicrous. As outlined in the MONAC brochure, MONAC had provided two appraisals to petitioners, albeit lower appraisals. Petitioners, unsatisfied with the MONAC appraisals, which were egregious, sought the assistance of Bates and adopted her appraisal because it was the highest. We find this fact to be indicative of petitioners' unrestrained objective; to achieve excessive and abusive valuations of the donated items.

We find that Hoover was a credible and knowledgeable witness. He valued the 194 etchings at $4,950. Respondent determined the fair market value to be $5,000. We agree with respondent.

*Section 6621(d) Addition to Interest*

We now turn to the issue of whether, under section 6621(d), petitioners are subject to an addition to tax. Section 6621(d) provides for an increase in the interest rate due on underpayments where there is a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Sec. 6621(d)(1) and (2). This addition applies to interest accruing after December 31, 1984. A "tax motivated transaction" is defined as including "any valuation overstatement (within the meaning of section 6659(c))."[13] Sec. 6621(d)(3)(A)(i). Under section

---

[13]Sec. 6659 provides an addition to the tax at graduated rates where an underpayment of at least $1,000 is attributable to a valuation overstatement. Sec. 6659(f) applies the highest rate of 30 percent to valuation overstatements of "charitable deduction property." The provisions of sec. 6659(f) apply to returns filed after Dec. 31, 1984, and do not apply in the instant case. We take judicial notice of the clear congressional intent to penalize individuals, such as petitioners, who grossly overvalue "charitable deduction property."

6659(c), a "valuation overstatement" exists if the value of property claimed on a return is at least 150 percent greater than the amount determined to be the correct valuation of the property.

Section 6621(d)(4) provides the Tax Court with jurisdiction to determine the portion (if any) of a deficiency which is a substantial underpayment attributable to tax motivated transactions. In the instant case, we raise the section 6621(d) issue sua sponte. Section 6621(d) was enacted on July 18, 1984, after the trial of this case. In connection with the enactment of this provision, the Conference Committee stated that:

The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court. * * * The Court should * * * *assert, without hesitancy* in appropriate instances, the penalties that the Congress has provided. [H. Rept. 98–861 (Conf.) (1984), 1984–3 C.B. (Vol. 2) 239. Emphasis added.]

Thus, Congress not only intended the Tax Court to raise section 6621(d) on its own motion, but actively urged the Court to do so when appropriate.

In *Law v. Commissioner*, 84 T.C. 985 (1985), we considered the Commissioner's post-trial motion to amend his answer to assert the applicability of section 6621(d). Because the Commissioner asserted numerous alternative grounds as the basis for the deficiencies, not all of which were on the list of "tax motivated transactions," we found that significant legal questions might be raised as to the application of section 6621(d). On that basis, we found that the taxpayer in *Law* would be prejudiced if the Commissioner's motion was granted.

Because we are not faced with a multiplicity of issues, the instant case is clearly distinguishable from *Law*. Overvaluation of property was the sole ground raised by respondent in the notice of deficiency, and valuation was the only matter at issue in the trial of this case. Petitioners had an opportunity to present any evidence available to them that was appropriate to support their valuation claims, and petitioners also were able to present in their briefs all relevant arguments concerning their donation. Thus, it does not work a prejudicial hardship upon petitioners for us to raise this issue post trial. See *Law v. Commissioner, supra* at 990. Rather, petitioners' blatant misuse of the charitable donation provisions by the

flagrant overvaluation of the items contributed reflects sinister shadows on the integrity of their scheme. This case is a candid example of the kind of abuse at which section 6621(d) is directly aimed.

In the instant case, it is clear that petitioners participated in a scheme to generate egregious charitable contribution deductions through the gross overvaluation of the items donated. In essence, Schoenberg arranged for petitioners to give the artifacts to MONAC in exchange for documentation to support and add verisimilitude to the overvaluation petitioners claimed on their 1976 return. As to the etchings donated in 1977, the MONAC-arranged appraisals and the Bates appraisals all were prepared in a manner suggestive of tax abuse.

As a result of their overvaluations, a "substantial underpayment" of petitioners' taxes occurred. The resulting deficiency was greater than $1,000. This substantial underpayment was due to petitioners' "valuation overstatements," as the values claimed on petitioners' returns were greater than 150 percent of the amounts we have determined to be the correct valuations of the artifacts and etchings.[14] Consequently, for purposes of section 6621(d), petitioners' involvement in a "tax motivated transaction" resulted in their substantial underpayment of taxes.

As the valuation overstatements were the sole source and cause of petitioners' deficiency, we would be ignoring, and remiss in applying, a congressional mandate should we fail to apply the provisions of section 6621(d) in this instance. However, "we do not intend to avoid our responsibilities" but shall administer to them as we must. Therefore, we find that petitioners are liable for the addition to tax under section 6621(d) on the interest which accrues upon the full amount of the deficiency after December 31, 1984.

Based on the foregoing,

*Decision will be entered for the respondent.*

---

[14]Artifacts, $19,618; etchings, $5,000.