EDWIN J. CUNNINGHAM, JR. AND ELIZABETH F. CUNNINGHAM, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cunningham v. Commissioner
Docket Nos. 30399-85, 5536-86.
United States Tax Court
T.C. Memo 1987-298; 1987 Tax Ct. Memo LEXIS 298; 53 T.C.M. (CCH) 1133; T.C.M. (RIA) 87298; June 16, 1987. Paul J. Seele, for the petitioners. Douglas W. Hinds, for the respondent. KORNER
MEMORANDUM FINDINGS *299 OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 6659 [1]
1980
$10,983.59
1981
6,616.85
1,985.06
1982
7,272.67
2,158.41
Respondent determined that all of the underpayments of taxes for 1980 and 1981, and $7,194.72 of the underpayment for 1982, are subject to interest at a rate determined under section 6621(d). [2]
After concessions, [3] the issues that we must decide are: 1. The charitable contribution deductions petitioners are entitled to in 1980, 1981, and 1982, for their charitable donations of three pieces of jewelry. 2. Whether petitioners are liable for the addition to tax under section 6659 for 1981 and 1982 on the underpayments attributable to their *300 charitable contribution deductions for two of the pieces of jewelry. 3. Whether petitioners are subject to interest at a rate determined under section 6621(c) on the underpayments attributable to their charitable contribution deductions for the three pieces of jewelry. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners were residents of St. Louis, Missouri, when they filed their petition herein. They timely filed joint Federal income tax returns for each of the three years at issue. The deficiencies in issue are attributable to the charitable contribution deductions petitioners claimed for their donations of three pieces of jewelry. Petitioners donated one of the pieces of jewelry in each of the years 1980, 1981, and 1982. Petitioners had purchased each of the pieces of jewelry from Gary R. Hansen of St. Louis, Missouri. [4]
*301 1980 Donation
Petitioners' 1980 donation was an emerald and diamond pendant (the "emerald pendant"). Petitioners purchased the emerald pendant for $5,000 on November 8, 1979. They donated it to the Smithsonian Institution on December 29, 1980, and claimed a $26,985 charitable contribution on their 1980 return for the donation. [5] They deducted that entire amount from their 1980 income. 1981 Donation
Petitioners' 1981 donation was a garnet pendant. Petitioners purchased the garnet pendant for $3,000 on November 8, 1979. They donated it to the Smithsonian Institution on December 29, 1981, and claimed a $16,205 charitable contribution on their 1981 return for the donation. They deducted that entire amount from their 1981 income. 1982 Donation
Petitioners' 1982 donation was a sapphire pendant. Petitioners purchased the sapphire pendant for $4,000 on October 27, 1980. They donated it to the Carnegie Museum of Natural History on December 29, 1982, and claimed a $22,450 charitable contribution on their 1982 return for the donation. [6] They deducted that *302 entire amount from their 1982 income. Respondent's Audit
Respondent audited petitioners' returns and determined that the fair market value of the emerald pendant donated in 1980 was $3,333 rather than the $26,985 shown on the 1980 return, that the fair market value of the garnet pendant donated in 1981 was $2,000 rather than the $16,205 shown on the 1981 return, and that the fair market value of the sapphire pendant donated in 1982 was $5,000 rather than the $22,450 shown on the 1982 return. Respondent determined that the underpayments for 1981 and 1982 attributable to the charitable contribution deductions petitioners claimed for the garnet and sapphire pendants are subject to the addition to tax provided by section 6659. Respondent determined also that the underpayments for 1980, 1981, and 1982 attributable to the charitable contribution deductions petitioners claimed for the three pieces of jewelry are subject to interest at the rate provided by section 6621(c). The market in which the donated jewelry would have been sold most commonly to persons who *303 ultimately use them is the retail market. The fair market value of the sapphire pendant donated in 1982 was $3,744. The underpayments resulting from petitioners' overstatement of the values of the three pieces of jewelry was greater than $1,000 in each of the years 1980, 1981, and 1982. OPINION Charitable Deduction
The first issue for our decision is the proper charitable deduction allowable for each of the three pieces of jewelry donated by petitioners. Petitioners are entitled to claim as charitable contributions the fair market values of the items, as of the dates they contributed them to the charitable donees, in accordance with section 170. Sec. 1.170A-1(e)(1), Income Tax Regs. Fair market value is the price at which the items would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. Fair market value may be determined based upon the price at which the items would have changed hands in the markets in which they would have been sold most commonly to persons who ultimately use them. Anselmo v. Commissioner,80 T.C. 872, 881-882 (1983), *304 affd. 757 F.2d 1208 (11th Cir. 1985). Fair market value is a question of fact to be determined by an examination of the entire record. Skripak v. Commissioner,84 T.C. 285, 320 (1985). Petitioners have the burden of proving that they are entitled to larger charitable contributions for the emerald and garnet pendants than respondent allowed in his notices of deficiency. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Respondent has the burden of proving that the fair market value of the sapphire pendant was less than he determined. Rule 142(a). In the present case expert witnesses testified on behalf of both petitioners and respondent. Both parties have now conceded that their original valuations of the jewelry were inaccurate. Petitioners now contend that the proper fair market values are those given by their expert: $21,774 for the emerald pendant donated in 1980, $13,738 for the garnet pendant donated in 1981, and $21,893 for the sapphire pendant donated in 1982. Respondent now contends that the proper fair market values are the average of those given by his experts: $5,091 for the emerald pendant donated in 1980, *305 $3,290 for the garnet pendant donated in 1981, and $2,972 for the sapphire pendant donated in 1982.[7] The opinions of experts are admissible and relevant to the issue of value, but the opinions must be weighed in light of each expert's qualifications and all other relevant evidence of value. Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). The Experts
Petitioners rely on appraisals performed by Sarabeth Koethe to establish that the fair market values of the jewelry exceeded the amounts determined by respondent. [8] Koethe is the president of Gem-Sciences International of Orange, California. *306 She is a graduate gemologist, and has taught classes in colored stone and gem identification. She prepared and wrote a degree program in gemology for a college in southern California. She neither bought nor sold jewelry at the retail level during 1980, 1981, and 1982. She has never taken any formal appraisal courses with a recognized appraisal society, and has never had her proficiency in performing appraisals tested by a recognized appraisal society. Respondent relies on appraisals performed by Elly Rosen and Eric Freedman to support his determination of the fair market values of the jewelry. [9] Rosen is an independent appraiser of gems and has extensive experience evaluating, appraising, buying, and selling gemstones. [1]0 During 1980, 1981, and 1982, he was actively engaged in purchasing, selling, and appraising gemstones and jewelry. He is a graduate gemologist and has additionally received formal training in the field of jewelry appraisal. [1]1 He has been engaged in appraising and evaluating gemstones and jewelry for about ten years and has lectured and published articles on the principles of jewelry appraisal. Rosen *307 examined, tested, and graded the three pieces of jewelry in his office in Brooklyn, New York. His procedure was to first examine the symmetry and overall appearance of the jewelry. He then authenticated the gemstones contained in the jewelry and graded their color, brilliance, extinction, zoning, clarity, proportion, symmetry, cut and polish. After completing his examination, Rosen valued the jewelry based on his experience in the jewelry business. Freedman is the president of B. Freedman Jewelers, Inc. of Huntington Village, New York, [12] is an instructor of Appraisal Studies at C. W. Post College, and is the director of one of the only two accredited gem testing laboratories *308 in the New York City metropolitan area. He bought and sold jewelry at the retail level during the years at issue. In addition to being a graduate gemologist, he is both a certified gemologist and a certified gemologist appraiser. In order to become a certified gemologist appraiser, Freedman was required to pass an examination on the appraisal of jewelry. Freedman examined and tested the three pieces of jewelry at his laboratory in Huntington, New York. He evaluated the mountings and the quality and size of the gemstones contained in the jewelry, and appraised the value of the jewelry based on sales of similar items he had made or had seen made. The Appraisals
Emerald Pendant
Koethe appraised the emerald pendant by estimating the value of its components. She identified its components as a 19.39-carat emerald set in a platinum and gold setting bordered by 21 diamonds weighing a total of 1.57 carats. In her opinion, the majority of jewelry similar to the emerald *309 pendant was sold by auction houses. She accordingly valued the emerald by referring to prices that had been realized at auctions for jewelry containing large emeralds. She identified what she considered to be jewelry containing comparable emeralds by reviewing the pictures contained in catalogs of auctions that had been held previously. She then estimated the values of the emeralds contained in the auctioned jewelry by subtracting from the prices that had been realized for the jewelry her estimate of the costs of the jewelry's other components. Based on her analysis, she estimated that the value of the emerald was $16,482, and that the value of its setting was $2,384, as of 1986. She increased the value of the emerald to $19,390 to arrive at her $21,774 estimate of the emerald pendant's market value as of December 1980. [13]
Rosen and Freedman also appraised the emerald pendant. Rosen conceded that the emerald is large, but stated that it is of extremely poor quality and is very undesirable. He explained that the emerald is heavily included, improperly cut, and cracked. *310 He stated that the emerald had been cut into a flat shape that accentuates its poor color and inclusions. He described the crack as so serious that he was afraid to take the emerald out of its setting to weigh for fear it would fall apart. Rosen stated that the emerald's flaws drastically lowered its value, and appraised its retail value as $5,200 as of December 29, 1980. Freedman stated that the emerald contained in the pendant is of extremely poor quality. [14] He agreed with Rosen that it was poorly cut and that it is very fragile. He labeled it the worst cut gemstone he had even seen. He described its crack as being huge and as running right through the middle of the emerald. He explained that the crack made the emerald extremely fragile. He noted further that the emerald had been oiled heavily, which he said reduces its value significantly. Freedman concluded that the emerald pendant had a retail value of $4,982 as of December 1980. Garnet Pendant
Koethe appraised the value of the *311 garnet pendant by estimating the value of its components. She identified its components as a 27.87-carat garnet set in an 18-carat gold setting. She valued the garnet based on the prices listed for malaya garnets in price lists published by gem dealers, and based on the price realized for one malaya garnet sold in May of 1984. She estimated that the value of the garnet was $11,148, and that the value of its gold setting was $500, as of 1986. She increased the value of the garnet to $13,238 to arrive at her $13,738 estimate of the garnet pendant's market value as of December 1981. [15]
Rosen stated that the garnet pendant is a pleasant piece but that its color is nowhere near the ideal color of a malaya garnet. He explained that it has more brown, and not enough peach and orange color, than is present in ideal malaya garnets. Rosen stated that malaya garnets sold at a premium over other garnets only if they had the characteristic malaya color. Rosen concluded that the garnet pendant had a retail value of $2,100 as of December 29, 1981. Freedman agreed with Rosen that the *312 garnet lacked the "peachy-orangy kind of flamey color" characteristic of malaya garnets and instead had a much more common color. Freedman stated that he had sold a 24-carat malaya garnet in 1981 that was vastly superior to the malaya garnet in the pendant for about $100 a carat and that he knows of a superior 30-carat malaya garnet that has been offered for sale since 1978 or 1979 for $100 a carat. [16] Freedman concluded that the garnet pendant had a retail value of $4,480 as of December 1981. Sapphire Pendant
Koethe appraised the value of the sapphire pendant by estimating the value of its components. She identified its components as a 4.63-carat alexandrite-like sapphire and a 13.99-carat gray sapphire set in an 18-carat gold setting. She valued the alexandrite-like sapphire at $4,000 a carat retail based on the value of light-blue sapphires. She valued the gray sapphire at $200 a carat retail based on her experience with comparable stones which, in her opinion, wholesaled for between $80 and $100 a carat. She valued the gold setting at $575. She concluded that the sapphire *313 pendant had a retail value of $21,893 as of 1986 and testified that it had the same value in 1982. Rosen valued the sapphire pendant as a complete piece of jewelry. He explained that the complete piece is worth more than the sum of its parts. He stated that the two sapphires are undesirable and would be difficult to market individually because they do not fit into recognized color categories. He described the gray sapphire as undesirable because it is almost colorless. In his opinion, it would be more valuable if it were completely colorless. Rosen described the alexandrite-like sapphire as a mongrel. He stated that it lacks enough color change to qualify as an alexandrite, and that it is undesirable as a colored sapphire because it is a mixture of three colors, one of which does not go with the other two. He valued the completed sapphire pendant at $2,200 retail as of December 29, 1982. Freedman agreed with Rosen that the gray sapphire would be more desirable if it were completely clear and that the alexandrite-like sapphire was an oddity. He stated that the colors of the alexandrite-like sapphire were not the ideal colors sought in an alexandrite-like sapphire. In his *314 opinion, both sapphires are subcommercial quality and are neither unique nor exceptional. He concluded that the sapphire pendant had a $3,744 retail value as of December 29, 1982. [17]
Analysis of Appraisals
Rosen and Freedman identified a number of errors in Koethe's appraisals. The errors, which are discussed below, explain why Koethe's appraisals resulted in values of a minimum of three times the values appraised by Rosen and Freedman. Emerald Pendant
Koethe appraised the emerald in the emerald pendant by referring to prices that had been realized at auctions for jewelry containing emeralds. She admitted that she is aware that photographs contained in auction catalogs can be retouched and usually distort the color of stones. She nevertheless selected items of jewelry containing what she considered to be comparable emeralds from photographs contained in auction catalogs without physically inspecting the jewelry. Rosen and Freedman agreed that the emerald in the emerald pendant *315 was of a lower quality than emeralds that would have been sold at the auctions identified by Koethe. Rosen went through the auction catalogs used by Koethe and indicated why the emerald jewelry that she selected from the catalogs did not contain comparable emeralds. He stated that it was ludicrous to compare a number of the emeralds contained in the catalogs with the emerald in the pendant. Garnet Pendant
Koethe valued the garnet in the garnet pendant based on the prices listed in price lists for malaya garnets, and the price realized in a single sale of a malaya garnet. Rosen and Freedman identified two problems with that approach. The first problem is that the garnet was a poor example of a malaya garnet. Rosen and Freedman agreed that the garnet lacked the color that distinguishes malaya garnets from ordinary garnets. They agreed that the garnet had a darker and more common color. Rosen testified that malaya garnets that lacked the color characteristic of malaya garnets did not command the premium prices that those garnets received. The second problem with Koethe's appraisal of the garnet pendant is that the price lists she used to value the garnet do not necessarily *316 reflect the garnet's fair market value. Cf. Anselmo v. Commissioner,80 T.C. at 878 n. 6. Freedman testified that it is wrong to equate list prices with fair market value and stated as an example that it was possible to purchase items for up to 50 percent less than the prices listed in one well-known list. Rosen also emphasized that catalog prices cannot be relied upon to reflect fair market values, and that catalog prices are regularly higher than market values. Sapphire Pendant
Koethe appraised the value of the alexandrite-like sapphire at $4,000 a carat retail based on the value of light-blue sapphires. The obvious problem with her approach is that the alexandrite-like sapphire is not a light-blue sapphire. [18] Rosen testified that it is improper to value alexandrite-like sapphires based on the value of blue sapphires. He stated that alexandrite-like sapphires should be valued based on the value of other alexandrite-like sapphires. Rosen and Freedman's *317 testimony convinced us that Koethe's appraisals do not reflect the fair market values of the three pendants donated by petitioners. We accordingly hold that petitioners have failed to prove that the fair market values of the emerald and garnet pendants exceeded $5,091 and $3,290, respectively, as conceded by respondent. Respondent has the burden of proving that the fair market value of the sapphire pendant was less than the $5,000 he determined in his notice of deficiency. Rule 142(a). Respondent asserts that the fair market value of the sapphire pendant was $2,972, the average of the values determined by his experts Rosen and Freedman. Although we have concluded that both appraisers were well qualified and that both appraisals were carefully performed, we consider the Freedman appraisal to be more persuasive, and we have accepted it. Accordingly, we hold that respondent has proved that the fair market value of the sapphire pendant was $3,744. [19]
*318 Section 6659
Section 6659 provides, as is relevant here, for an addition to tax on underpayments attributable to valuation overstatements. Section 6659(c) defines valuation overstatement to include, inter alia, the claim on a return of a valuation of 150 percent or more of the correct valuation. Respondent determined in his notices of deficiency that the underpayments in 1981 and 1982 attributable to the charitable contribution deductions petitioners claimed for the garnet and sapphire pendants are due to valuation overstatements. Petitioners claimed on their 1981 return a value of $16,205 for the garnet pendant and claimed on their 1982 return a value of $22,450 for the sapphire pendant. We have already held that petitioners are entitled to charitable contribution deductions of only $3,290 and $3,744 for the garnet and sapphire pendants, respectively. As $16,205 and $22,450 are more than 150 percent of $3,290 and $3,744, respectively, we hold that petitioners are liable for the addition to tax provided by section 6659 for 1981 and 1982 on the portions of their underpayments attributable to their overstatements of the values of the garnet and sapphire pendants. Section *319 6621(c)
Respondent determined in his notices of deficiency that petitioners' underpayments attributable to the charitable contribution deductions they claimed for the emerald, garnet, and sapphire pendants are subject to interest at the rate determined under section 6621(c). Section 6621(c) provides for a rate of interest on substantial underpayments attributable to tax motivated transactions of 120 percent of the underpayment rate established under section 6621. The rate applies to interest accruing after December 31, 1984, even if the tax motivated transaction occurred prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986); sec. 301.6621-2T, Q-10 and A-10, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50393 (Dec. 28, 1984). To be subject to the rate, the aggregate underpayment for a year attributable to all tax motivated transactions must exceed $1,000. Sec. 6621(c)(2). Tax motivated transactions include, inter alia, valuation overstatements within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). We have already upheld respondent's *320 determination that the portions of petitioners' 1981 and 1982 underpayments attributable to the charitable contribution deductions they claimed for the garnet and sapphire pendants are due to valuation overstatements. The portion of petitioners' underpayment for 1980 attributable to the deduction they claimed for their donation of the emerald pendant was due also to a valuation overstatement. Petitioners claimed on their 1980 return a value of $26,985 for the emerald pendant donated in that year. We have held that petitioners have failed to prove that the emerald pendant was worth more than $5,091. The $26,985 value petitioners claimed is more than 150 percent of $5,091. We found as a fact that the underpayments attributable to petitioners' valuation overstatements exceeded $1,000 in each of 1980, 1981, and 1982. We accordingly uphold respondent's determination that the rate of interest determined under section 6621(c) applies to the underpayments caused by those valuation overstatements. To reflect the foregoing, Decisions will be entered under Rule 155.
Appendix Edwin J. and Elizabeth F. Cunningham, Jr.
Contributions of Jewelry
1980, 1981, and 1982
Value Per
Purchase
Value Claimed
Petitioners'
Item
Price
on Return
Expert Koethe
1980 Donation
Emerald Pendant
$5,000
$26,985
$21,774
1981 Donation
Garnet Pendant
$3,000
$16,205
$13,738
1982 Donation
Sapphire Pendant
$4,000
$22,450
$21,893
*321 Edwin J. and Elizabeth F. Cunningham, Jr.
Contributions of Jewelry
1980, 1981, and 1982
Value Per
Respondent's Experts
Item
Freedman
Rosen
Average
1980 Donation
Emerald Pendant
$4,982
$5,200
n1 $5,091
1981 Donation
Garnet Pendant
$4,480
$2,100
n1 $3,290
1982 Donation
Sapphire Pendant
$3,744
$2,200
[2] $2,972
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A)-(C) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750.↩
3. The parties have stipulated that in 1982 petitioners overreported their interest income by $90 and overstated their deductions by $284.↩
4. The prices petitioners paid are set forth in the Appendix.↩
5. It is stipulated that the Smithsonian Institution qualifies as a charitable donee under sec. 170(c).↩
6. It is stipulated that the Carnegie Museum of Natural History qualifies as a charitable donee under sec. 170(c).↩
7. We treat respondent's present position as a concession, pro tanto, of the values determined in his statutory notices herein for the emerald and garnet pendants. Respondent has filed an amended answer in which he alleges that the fair market value of the sapphire pendant was $2,972 rather than the $5,000 he determined in his notice of deficiency.↩
8. Koethe's appraisals are set forth in the Appendix.↩
9. Rosen's and Freedman's appraisals are set forth in the Appendix.
Values conceded by respondent. [1]0 See Price v. Commissioner,T.C. Memo. 1985-182, for a further description of Rosen's qualifications.
[1]1 He became a designated member of the International Society of Appraisers in April 1985 after completing the required courses and passing the necessary examinations. He has been a senior member of the American Society of Appraisers since June 1980 and has completed that society's appraisal testing procedure.↩
12. B. Freedman Jewelers, Inc. operates a retail jewelry store. As its president for the 17 years preceding trial, Freedman bought a majority of its jewelry and made a large percentage of its sales.↩
13. Koethe's appraisal indicates that the market value of the emerald decreased between 1980 and 1986.↩
14. Freedman emphasized its poor quality by stating that when he compared the emerald with poor quality emeralds contained in his inventory it had made them look like gems.↩
15. Koethe's appraisal indicates that the market value of the garnet decreased between 1981 and 1986.↩
16. Freedman did not indicate whether the prices referred to were wholesale or retail.↩
17. He concluded that the gold setting had a $1,000 retail value, that the gray sapphire had a $1,120 retail value, and that the alexandrite-like sapphire had a $1,624 retail value.↩
18. Freedman described the color as brownish-orange yellow which changes to orange yellow and purplish red in high amounts of light. Rosen described the color as orangy-yellow/slightly purplish red.↩
19. The value of the sapphire pendant is less than the amount petitioners paid for it. Although this Court has recognized that the actual price paid for an item is evidence of the item's fair market value, it has also recognized that the actual sales price is not always the best evidence of value. See Price v. Commissioner,T.C. Memo. 1985-182. It is not unusual for taxpayers who have little expertise in the market for goods to pay more than fair market value for the goods. See, e.g., White v. Commissioner,T.C. Memo. 1987-251↩. In the circumstances of this case, we consider it to be neither surprising nor unusual that petitioners paid more than fair market value for the pendant. We would, in fact, have been surprised if petitioners had obtained the pendant for significantly less than its fair market value as was suggested by their expert Koethe. As respondent's expert Rosen stated, the seller of the pendant was a knowledgeable dealer of jewelry. Knowledgeable dealers would not be expected to give bargains.
2. Value determined by respondent in amended answer.↩