CHARLES J. QUANTZ AND NANCY QUANTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Quantz v. Commissioner
Docket No. 1188-83; 27712-83.
United States Tax Court
T.C. Memo 1987-358; 1987 Tax Ct. Memo LEXIS 358; 53 T.C.M. (CCH) 1402; T.C.M. (RIA) 87358; July 22, 1987. Charles J. Quantz, pro se. Theodore Garelis, *359 for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1978 and 1979 in the amounts of $ 162,296.95 and $ 79,544.00, respectively. In amended answers filed in each of these consolidated cases respondent increased the deficiency for each year to $ 323,518 for 1978 and $ 372,668 for 1979. After concessions by both parties, the issues for decision are (1) the amount of stock received by petitioners in exchange for legal services rendered which must be included in income for the years in issue, and (2) the fair market value of the stock received. FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner was a resident of San Francisco, California at the time he filed the petition herein. During the years in issue, petitioner Charles J. Quantz ("petitioner") acted as legal counsel to Advanced Patent Technology ("APT" or "the company"), a Nevada corporation engaged in licensing the use of patents. Petitioner rendered services *360 to APT primarily in connection with securities law matters. During the years 1978 and 1979 APT had a cash flow problem, and petitioner agreed to accept unregistered common stock in the company as compensation for his services. Initially, petitioner billed his services at the rate of $ 80 to $ 100 per hour. Petitioner was to receive one share of stock for each dollar in fees. Subsequent correspondence between petitioner and APT's president indicates that petitioner agreed to an informal arrangement whereby petitioner would not sell more than 20 percent of his stock in any one year. In exchange for his consent to this arrangement, petitioner increased the rate at which he billed his services to $ 125 per hour. Stock he billed transferred to petitioner in the following manner. After the issuance had been authorized by APT, petitioner, as APT's counsel for securities matters, would write a letter to the transfer agent in which he set forth his legal opinion that all Federal and State securities requirements had been satisfied or that the issuance of shares was exempt from such requirements. He would then request that the authorized number of shares be transferred to himself. The *361 dates of the letters and the number of shares to be issued to petitioner were as follows: Date
Number of shares
March 27, 1978
35,000
July 21, 1978
56,000
February 12, 1979
3,500
May 17, 1979
30,000
November 1, 1979
80,000
The records of the transfer agent for APT show that stock was issued to petitioner in 1978 and 1979 on the dates and in the amounts as follows: Date
Number of shares
January 4, 1978
31,793
April 4, 1978
35,000
July 27, 1978
56,000
March 5, 1979
3,500
May 25, 1979
30,000
November 19, 1979
80,000
The stock ledger of APT shows stock was issued to petitioner on the dates and in the amounts as follows: Date
Number of shares
April 14, 1978
35,000
July 27, 1978
56,000
March 4, 1979
3,500
May 25, 1979
30,000
December 19, 1979
80,000
Finally, an exhibit attached to the Form S-1, Registration Statement filed by APT with the Securities Exchange Commission ("SEC") on September 29, 1980, under the Securities Act of 1933, lists stock issued to petitioner on the dates and in the amounts set forth below: Date
Number of shares
January 4, 1978
31,793
April 4, 1978
35,000
July 27, 1978
56,000
March 5, 1979
3,500
May 25, 1979
30,000
November 19, 1979
80,000
*362 Petitioner executed five Common Stock Purchase Agreements on or about the same dates (except January 4, 1978) that stock was issued to petitioner. The agreements contain statements that the shares were being issued in lieu of payment for services to be rendered to the company and as a retainer for availability of petitioner's legal services for a designated period. Petitioner reported the receipt of APT stock Schedule C attached to his 1978 Form 1040 as follows: January 1, 1978
31,793 shares at .40/share
April 7, 1978
35,000 shares at .50/share
July 27, 1978
33,848 shares at .60/share
Total value of stock received: $ 50,524.20
Petitioner reported receipt of APT stock for the 1979 tax year on Schedule C attached to his 1979 return as follows: 65,156 shares at .60/share [no date given] Total value of stock received $ 39,093.60 In separate notices of deficiency, respondent determined that the fair market values of the APT stock petitioner reported receiving in 1978 and 1979, were $ 300,504.88 and $ 204,800.00, respectively. Subsequently in amended answers, respondent adjusted the amount of stock received and its fair market value, thereby increasing *363 the total fair market value of the stock received in 1978 and 1979 to $ 530,689.50 and $ 625,250.00, respectively. ULTIMATE FINDINGS OF FACT We find that petitioner received stock on the dates and in the amounts as follows: 1978 Tax Year
Date
Number of Shares
FMV
Value
January 4
31,793
1 1/4
$ 39,741.25
April 4
35,000
2 7/8
100,625.00
July 27
56,000
6 3/4
378,000.00
$ 518,366.25
1979 Tax Year
Date
Number of Shares
FMV
Value
March 5
3,500
3 7/8
13,562.50
May 5
30,000
4 3/8
131,250.00
November 19
80,000
6 1/8
300,000.00
$ 444,812.50
OPINION Petitioner acknowledges receipt of the stock issued to him in 1978 and 1979, with the exception of the 80,000 shares in November 1979, which he alleges were received in 1982. We deal with the latter question below. As to all stock, he argues that he was not required to include it in income until it was fully earned. Petitioner in his brief detailed various errors he made in calculating the number of hours billed to APT and the amount of stock thereby earned. This *364 emphasis on when the stock was "fully earned" is irrelevant. It is undisputed that petitioner reports income on the cash basis method. The rule is well-settled that a cash basis taxpayer is required to include income in the year it is actually or constructively received, regardless of whether future services may be required. Sec. 451(a). [1]
Section 83 provides special rules for the taxation of property transferred to an employee or independent contractor in connection with the performance of services. Sec. 1.83-3(f), Income Tax Regs. Under section 83, the fair market value of the property must be included in income in the first taxable year in which the property is transferable or is not subject to a substantial risk of forfeiture. Sec. 83(a). Section 83(c)(1) states that a substantial risk of forfeiture exists if the taxpayer's rights to full enjoyment of property are conditioned on the future performance of substantial *365 services. Section 1.83-3(c), Income Tax Regs. Petitioner argues that since he had not fully earned the stock at the time he received it, his rights to it were conditioned upon the future performance of services, and therefore, subject to forfeiture. Whether a risk of forfeiture is substantial depends on the facts and circumstances of each case. Section 1.83-3(c), Income Tax Regs. The evidence in the record does not support petitioner's claim that he was required to perform substantial future services in order to prevent forfeiture. It is clear from the stock purchase agreements that the stock was given in part as consideration for the availability of legal services as well as for the actual performance of services in the future. There is nothing in the record to suggest petitioner did not receive immediate full dominion and control over the stock or that it might be forfeited for any reason. The informal agreement restricting petitioner to sales of not more than 20 percent of his stock is too vague and uncertain to constitute a restriction *366 as contemplated by section 83, particularly where there has been no showing that the stock received in any year constituted more than 20 percent of petitioner's holdings. Accordingly, we find that the stock received by petitioner in 1978 and 1979 was includible in his income for those years. As for the block of 80,000 shares issued on November 19, 1979, petitioner claims that those shares were not received by him until 1982. Petitioner's evidence to support this claim consisted of his own testimony and that of his former secretary, Lillie Taniguchi. We find that neither witness was very credible. Ms. Taniguchi testified that she recalled receiving the certificates for the 80,000 shares in 1982. However, that date is inconsistent with her notation on a ledger she kept to account for stock received from APT which shows a date of "1/ /81 or 2/ /81." The testimony of both witnesses is inconsistent with all of the stock records in evidence, including petitioner's letters requesting transfer, the transfer agent's records, the stock ledges and the Form S-1 filed with the SEC. We are not obligated to accept self-serving and implausible testimony. Geiger v. Commissioner,440 F.2d 688 (9th Cir. 1971), *367 affg. a Memorandum Opinion of this Court. Accordingly, we find that petitioner received the 80,000 shares of stock in 1979. We turn now to the issue of the value of the stock received. Since we have found that petitioner received the stock as of the dates it was issued, its fair market value must be determined as of those dates. To establish the fair market value of the stock issued to petitioner, respondent relies on appraisals performed by Ronald Hansen, a duly qualified expert. During the years in issue, APT stock was publicly traded. In determining the value of the stock, Hansen reviewed quotations in the National Quotation Bureau which contains actual market transactions by securities dealers who served as brokers for the purchase or sale of APT common stock in the unlisted market. Hansen used this quotation service because in this opinion it was the most generally or readily available publication. He also examined quotations from the National Association of Securities Dealers ("NASDAQ") listed market for APT common stock. Hansen found no actual trades quoted on the dates APT stock was issued to petitioner. Therefore, Hansen looked at bid and ask quotes which occurred *368 on the nearest dates prior to an after the valuation dates. He arrived at a "best estimate" of the value of the stock on the given valuation dates by first determining the highest bid prices as quoted on the nearest dates before and after the valuation dates. He then calculated their average, weighted according to the number of days between the selling date and the valuation date. With respect to the large blocks of shares issued to petitioner, Hansen determined that the market could absorb those amounts of shares over a relatively short period of time, and therefore concluded that the value of the stock should not be discounted due to blockage. Hansen's best estimates of the fair market value of the APT stock are as follows: Date
Value
January 4, 1978
$ 1 1/4
April 4, 1978
$ 2 7/8
July 27, 1978
$ 6 3/4
March 5, 1979
$ 3 7/8
May 25, 1979
$ 4 3/8
November 19, 1979
$ 6 1/8
Petitioner presented no expert testimony or report on the value of the stock. At trial however, with respect to the block of 80,000 shares, petitioner established that the Daily Stock Price Record reflected bid and ask prices of $ 4 3/8 and $ 4 7/8, respectively, for APT stock *369 on November 30, 1979. Additionally, petitioner's brokerage account statements for the month of November 1979 show trades of APT stock by petitioner. The trades on the nearest dates before and after November 19 occurred on November 5 when petitioner sold 4,960 shares at $ 4 per share and November 21, when petitioner sold 1,060 shares at $ 3 3/4 per share. Petitioner argued that we must respect the designation of the value of the stock of $ 1.00 per share as agreed to by petitioner and APT. To support his argument, petitioner cites section 1.61-2(d)(1), Income Tax Regs., which provides that if services are rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary. However, since we have persuasive evidence to the contrary, we are not bound by the price agreed to by petitioner and APT. The opinions of experts are admissible and relevant to the issue of value, but the opinions must be weighed in light of the expert's qualifications and all other relevant evidence *370 of value. Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). We are persuaded that Hansen's appraisals were performed with adequate care and that his estimates of value are reasonably accurate as to all valuation dates with respect to which petitioner offered no evidence. Therefore, with respect to all stock except the 80,000 shares issued on November 19, 1979, we find the values estimated by Hansen to be the fair market value of the stock on the dates of issue. As for the block of 80,000 shares, however, we find that petitioner's brokerage account statement, which shows an actual trade of APT stock on November 21, 1979, constitutes the best evidence of the value of the stock on the issue date of November 19, 1979. Petitioner sold 1,060 shares at a price of $ 3 3/4 per share. That price is reasonably close to the bid and ask prices of $ 4 3/8 and $ 4 7/8 for APT stock quoted in the Daily Stock Price Record on November 30, 1979, as well *371 as to the price of $ 4 per share received by petitioner for 4,960 shares on November 5, 1979. Respondent's expert arrived at his estimate of $ 6 1/8 based on bid prices two months before and one month after the valuation date. Under these circumstances, we think it proper to disregard Hansen's opinion as to the block of 80,000 shares, and we find their value on November 19, 1979, to $ 3 3/4 per share. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue. ↩