T.C. Memo. 1996-30

UNITED STATES TAX COURT

ESTATE OF WILLIE C. LLOYD, DECEASED, IVA NELL HOLMAN, EXECUTRIX,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5223-91.          Filed January 29, 1996.

Stewart R. Dudley, J. Birch Bowdre, Samuel H. Frazier,

Elizabeth Ann McMahan, and Paul S. Leonard, for petitioner.

Linda J. Wise, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, Judge:  Respondent determined a deficiency in

petitioner's Federal estate tax in the amount of $1,275,416.

After concessions, the sole issue remaining for our decision is

the date-of-death value of decedent's one-half interest in two parcels of real estate held in trust.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein. Willie C. Lloyd (decedent) died on February 20, 1987. Executrix Iva Nell Holman (Holman) and executrix Myrtle Lee Spraggins (Spraggins) both resided in Anniston, Alabama, at the time the petition was filed in this case. Spraggins died during the pendency of this case.

1. General Background

On February 25, 1987, Holman and Spraggins offered decedent's will for probate. Decedent's will, dated February 5, 1987, left one-third of his estate to Mary Ann Brewer. Decedent's will also left a pecuniary bequest of $7,500 to his daughter, Jan Lloyd Rivers (Rivers). Both bequests were subject to an in terrorem clause intended to prevent a will contest. Decedent's will divided the residuary of his estate equally between his sisters, Holman and Spraggins, the executrices of his estate.

On March 5, 1987, Rivers initiated a will contest, contending that decedent died intestate and that Rivers was the sole heir and distributee of his estate. On that same date, Rivers petitioned for and received an appointment as special administratrix ad colligendum in the estate proceedings.

Decedent's Federal estate tax return was due to be filed on November 20, 1987.  Rivers, however, requested and received an extension of time to file that return.  An additional extension was requested and received, extending the due date of the return to November 20, 1988.  On June 16, 1988, an order was issued by the Circuit Court of Calhoun County authorizing Rivers to file the Federal estate tax return.  On June 22, 1988, consistent with that order, Rivers filed the Federal estate tax return (original return).  The original return, however, was not in a form capable of being processed by the Internal Revenue Service (IRS).  It contained the word "unknown" on essentially every line of the return.  Only line 1, involving the total gross estate, and lines 9 and 11, involving the unified credit, contained values of any significance.  The total gross estate, as listed on the original return, equaled $10,902,474.64.

In computing the total gross estate, it was necessary for Rivers to value two parcels of real estate (trust property) held in trust (trust) in which decedent possessed an undivided one-half interest on the date of his death (valuation date).  The first parcel (parcel A) contains approximately 65 acres of land, and the second parcel (parcel B) consists of approximately 10 acres of land.  Through her attorney, William Henry Agee (Agee), Rivers retained the services of T.E. Young (Young) and Gene Dilmore (Dilmore), two unaffiliated professional appraisers, for the purpose of valuing both parcels.  Relying on the appraisal

reports prepared by Young and Dilmore, the original return reflects the date-of-death values of decedent's interests in parcels A and B as $3,400,000 and $897,500, respectively.

On July 28, 1988, the Circuit Court of Calhoun County entered a Judgment of Final Settlement in the special administration in which the court approved a final accounting of the special administration, awarded fees to Rivers and her attorneys for the special administration, and directed that fees be paid to Holman and Spraggins as coexecutrices of decedent's estate. The parties to the will contest resolved their dispute shortly thereafter.

After the settlement of the will contest, Holman and Spraggins hired an accounting firm to facilitate their responsibilities as executrices of decedent's estate. In preparing an amended estate tax return (amended return), the accounting firm hired the Hearn Co. (Hearn) for the purpose of conducting another appraisal of the trust property. Relying on the Hearn appraisal, the amended return reflects the date-of-death values of decedent's interests in parcels A and B as $650,000 and $375,000, respectively. Holman and Spraggins filed the amended return on October 6, 1988. Unlike the original return, the amended return included specific amounts for each applicable line thereon and was capable of being processed by the IRS.

Respondent accepted the amended return but, relying on the appraisals conducted by Dilmore and Young, subsequently determined that the date-of-death values of decedent's one-half interests in parcels A and B were $3,400,000 and $900,000, respectively.

2.   Trust Background

On December 17, 1963, decedent, Jack E. Held (Held), Leonard M. Held, Sidney D. Held, and C. Ray Dudley (Dudley) entered into a trust agreement in which Held and Dudley were named trustees (trustees). Decedent held a one-half interest in the trust and the remaining one-half interest was divided among the other grantors. At the time the grantors created the trust, they entered into an agreement to purchase certain real estate. A principal purpose of holding the real estate in trust was to facilitate sales of such property to interested purchasers. The real estate acquired by the trust consisted of approximately 348 acres of unimproved land located in Jefferson County, Alabama. The property purchased was not within the corporate limits of any municipality. The tract was bisected by U.S. Highway 280 (Highway 280) and was bound on its southwestern border by Cahaba River Road.

Sometime during 1976, the State of Alabama condemned approximately 113 acres of the property held in trust in order to construct Interstate 459 (I-459). In an Alabama condemnation proceeding the State gives notice of the condemnation and takes

title immediately.  The condemnation award is thereafter determined.  Held and Dudley employed Henry V. Graham (Graham) to determine the value of this taking by the State of Alabama. Graham determined that the land subject to the taking was suitable for both residential and commercial development, and the value of the taking was $536,110.  Held and Dudley also retained Sidney W. Smyer, Jr. (Smyer), and Joe Scotch, Jr. (Scotch), to assess the value of the taking.  In his appraisal report, Smyer concluded that the highest and best use of the property subject to the taking was commercial in nature.  Scotch, though not expressly determining the highest and best use of the property subject to the taking, based his report on an analysis of comparable sales involving only commercial properties.  Scotch's conclusions paralleled Smyer's conclusions, and both determined that the value of the taking exceeded $2 million.  Upon its completion, I-459 bisected the trust property and intersected Highway 280, forming an angle of approximately 90 degrees.

Throughout the course of the 7-year period ending in 1980, the trust was involved in the sale of between 7 and 10 acres of trust property to Cahaba Mall, Inc., a company owned by James Grimmer (Grimmer).  This property is located west of Highway 280 and south of I-459.  Grimmer paid $15,000 per acre in partial consideration for the property.

In March 1977, the trust and South Central Bell Telephone Co. (Bell) initiated arrangements for the purchase of some of the

property held in trust.  Approximately 50 acres, located west of Highway 280 and north of I-459, was acquired by Bell in March 1978 at a price of $17,750 per acre.  The deed from the trust granted Bell an easement over a portion of the remaining trust property separating the subject property from Cahaba River Road for the purpose of connecting necessary utilities.

Subsequent to its purchase of the property, Bell filed an application requesting to have the subject property rezoned to accommodate commercial office usage.  Bell's rezoning request was approved by the county zoning commission.  Approval of the rezoning request, however, was contingent upon Bell's agreement not to build an access road to its property from Cahaba River Road for a period of 25 years.  The minutes of the zoning commission's hearing suggest that a principal factor underlying this restriction was the zoning commission's desire not to subject the residential area west of Cahaba River Road to commercial development and an accompanying increase in traffic along Cahaba River Road.  Bell agreed to the restriction, but expressly reserved the right to apply to the commission for relief from the prohibition in the event that the character of the surrounding area experienced sufficient change to warrant reconsideration.

In 1981, approximately 7 acres of trust property located east of Highway 280 and south of I-459 was sold to T.S. O'Rourke (O'Rourke) and Marion Bradford (Bradford).  The property subject

to this sale was to be coupled with abutting property already owned by O'Rourke and Bradford for the purpose of constructing a commercial building. This property was sold at a price of $25,000 per acre.

Following the condemnation and the sales to Bell, Grimmer, and O'Rourke and Bradford, the property held in trust consisted of approximately 65 acres located west of Highway 280 and north of I-459 (parcel A), and approximately 10 acres located east of Highway 280 and north of I-459 (parcel B). The property encompassed by parcels A and B is the subject matter of the instant case.

3. Trust Property

Parcel A abuts and somewhat straddles the Bell property. Cahaba River Road serves as its western border. It contains a substantial amount of vegetation and an extensive amount of exposed rock. The terrain varies throughout the parcel. The southwestern portion of parcel A comprises a large ravine with slopes varying in degree, with some estimated as being as much as 30 degrees. The remainder of parcel A contains rough, rolling terrain and in various places consists of slopes approaching 30 degrees. Cahaba River Road intersects both Highway 280, to the north of parcel A, and I-459, near the southwesternmost point of parcel A. As a result, a crude right triangle is formed with Cahaba River Road serving as the hypotenuse and the intersection of Highway 280 and I-459 forming the right angle. Parcel A,

however, does not extend to the intersection of Cahaba River Road and Highway 280. Rather, an Alabama Power Co. right-of-way, intersecting both Cahaba River Road and Highway 280, forms the northern border of parcel A. As a result of this right-of-way, parcel A only abuts Highway 280 for approximately 300 feet. The Bell property consists of much of the center of this triangular area of land. The Bell property is a somewhat square piece of land abutting the intersection of Highway 280 and I-459 and extending almost to Cahaba River Road, leaving parcel A with an irregular shape resembling an hourglass.

Parcel B is a triangular piece of land located immediately across Highway 280 from the Bell property. A small hill or ridge separates parcel B from the intersection of Highway 280 and I-459. Prior to the construction of I-459, parcel B contained a large depression roughly 4 acres in size. Approximately 2 of the remaining 6 acres were moderately flat, and the remaining 4 acres consisted of steep, sloping terrain. As the depression subtracted from the utility of the parcel, Held and Dudley arranged to have it filled with excess earth and rock which had accumulated during the I-459 construction project. In some areas, the fill is estimated to be as much as 40 feet in depth. With the fill in place, approximately 6 acres of parcel B have a reasonably level grade.

Prior to 1985, parcels A and B were outside the corporate limits of the city of Birmingham, Alabama, and were zoned for

residential purposes. In 1985, the city of Birmingham annexed all of parcel B and approximately 31 acres of parcel A on its own initiative. The annexation program was primarily designed to increase the tax base of the city by bringing outlying commercial properties into the city's corporate limits. The portion of parcel A not annexed by the city of Birmingham included a strip of land, approximately 200 feet in width, running the length of that portion of parcel A which abuts Cahaba River Road. Despite this annexation, however, parcels A and B remained zoned for residential usage under the zoning classifications of the city of Birmingham and Jefferson County as of the valuation date. In November 1987, however, the zoning of parcel B was changed by the city of Birmingham to a business classification. Similarly, the zoning classification of that portion of parcel A within the corporate limits of the city of Birmingham was changed to permit business usage in 1991.

4. Transactions Involving Parcels A and B

In December 1976, Kovach & Associates (Kovach) offered to purchase approximately 25 acres of trust property located north of I-459 and west of Highway 280. The offer was for $40,000 per acre but was subject to numerous contingencies. In December 1977, the parties entered into a purchase and sale agreement involving 14 of the 25 acres at $43,571 per acre. This agreement was expressly contingent on the receipt of a zoning change with respect to the subject property. Shortly thereafter, Held, on

behalf of Kovach, filed a request to have the subject property rezoned to permit commercial office usage. The rezoning request was denied on July 25, 1978. The contractual agreement between the parties was never consummated as a result of the denial of the rezoning request.

Commencing in 1980, Held and Dudley received several offers to purchase parcel B. In 1980, John Runnion (Runnion) made an offer to purchase parcel B at a price of $2 per square foot, or $894,722. This offer was rejected by Held as not being reflective of the property's fair market value.

Also sometime during the early 1980's, Institutional Investment Corp. sought to purchase parcel B for $3,200,000. This offer, which was subject to numerous conditions, was never consummated.

In April 1985, Held entered into an agreement with an unidentified realty company with respect to the sale of parcel B. This agreement called for the purchase of parcel B at a price of $325,000 per acre, or a total of approximately $3,250,000. Nothing further developed from this offer.

In June 1985, Lincoln Property Co. (Lincoln) sought an option to purchase a portion of the trust property for $1,850,000, subject to a feasibility study. This offer was denied. Lincoln also sought to form a partnership with the trust to develop parcel B. The proposal, which was subject to numerous

contingencies, called for the contribution of parcel B to the partnership at a value of $3,200,000. This proposal was denied. Following the denial of the partnership proposal, Lincoln and Held continued to negotiate with regard to parcel B. In June 1986, Lincoln and the trustees entered into an agreement for Lincoln to purchase parcel B at a price of $7.35 per net usable square foot, or approximately $3 million. The agreement also involved a partnership affiliation between Lincoln and the trust. Lincoln possessed the right to terminate the agreement on feasibility grounds if it so desired. In September 1986, citing concerns with how modifications to Highway 280 might affect accessibility, Lincoln terminated the agreement.

Sometime prior to March 21, 1986, the trustees declined an offer to purchase parcel B at a price of $8 per foot, or approximately $3,550,000. The remaining terms and other conditions of this offer are unknown.

On October 9, 1987, Held wrote a letter to Jeffrey Bayer (Bayer), a listing agent, regarding past discussions involving parcel B. This letter informed Bayer that Held was willing to consider an offer for the purchase of parcel B that would net $3,200,000. Nothing further developed as a result of this letter.

In 1989, Held negotiated with Midland Title Security (Midland) for the sale of parcel B for $3,500,000. The property was to be used as a gas station and convenience store. Midland

purchased an option to purchase parcel B in April 1989.  In July 1989, Midland purchased an extension of the option acquired in April 1989.  The option, which contained numerous contingencies, was permitted to lapse by Midland on November 15, 1989.

5.   Respondent's Appraisal Reports

During the special administration of decedent's estate, two appraisals of parcels A and B were conducted.  These appraisals were conducted by Dilmore and Young, both professional real estate appraisers with noteworthy credentials.  Dilmore and Young were unaffiliated with each other at the time the appraisals were performed, and neither collaborated with the other while conducting his appraisal.

a.  Dilmore's Appraisal

In response to a request by Agee, Dilmore reported the results of his appraisal on June 8, 1988.  Dilmore's results are presented in what he refers to as a letter appraisal.  A letter appraisal is an informal presentation of the appraisal results. In Dilmore's professional judgment, the brevity of a letter appraisal was appropriate under the circumstances, as he was under the impression that the use of the appraisal was to be limited to private matters involving the parties related to decedent's estate.  In the cover letter to Agee, Dilmore explains that, consistent with Agee's request, the report is in abbreviated form and that data supporting the valuations presented are maintained in Dilmore's file.

In his appraisal report, Dilmore conducted a comparable sales analysis using 12 real property sales.  Each of the comparable sales used in Dilmore's analysis involved the sale of a commercial property which preceded decedent's date-of-death. Dilmore's report is based upon his conclusion that the highest and best use of the trust property, as of the valuation date, was commercial and that the zoning of both parcels could be changed from residential to commercial.  In his appraisal, Dilmore made adjustments to the comparable sales properties to account for the relative desirability of location, topography, accessibility, shape, and size.  An adjustment was also made to account for the year of sale.  These adjustments were made with respect to parcel

B only. Once the value of parcel B was determined, Dilmore used parcel B as the sole base property in determining the value of parcel A.

The results of Dilmore's analysis can be summarized as follows:

| Parcel | FMV per Acre | FMV of Parcel | FMV of Decedent's 50% Interest |
|--------|--------------|---------------|--------------------------------|
| A | $100,000 | $6,800,000 | $3,400,000 |
| B | 179,000 | 1,790,000 | 895,000 |

### b.   Young's Appraisal

Young furnished the results of his appraisal to Agee on June 10, 1988. Unlike the letter appraisal prepared by Dilmore, Young prepared a lengthy formal report. Young conducted a highest and best use analysis and concluded that the highest and best use of both parcels of trust property was commercial in nature. Young performed a comparable sales analysis using six real property sales all of which preceded the date of decedent's death. The 6 properties used by Young were among the 12 properties used by Dilmore in his appraisal. Each comparable sale property used by Young consisted of commercial property and was located in the vicinity of Highway 280 and both parcels of trust property. In arriving at his conclusions, Young's analysis involved making adjustments to the comparable sale properties for numerous factors, including location, frontage influence, corner influence, zoning, and utilities. The comparable sale properties

were also adjusted to account for the date upon which the comparable sale occurred and the physical characteristics of the land involved.

The results of Young's analysis can be summarized as follows:

| Parcel | FMV per Acre | FMV of Parcel | FMV of Decedent's 50% Interest |
|--------|--------------|---------------|-------------------------------|
| A | $100,000 | $6,800,000 | $3,400,000 |
| B | 180,000 | 1,800,000 | 900,000 |

6.  Petitioner's Appraisal Reports

Petitioner bases its argument on the results of appraisal reports prepared by two experts, Hearn and Lonnie Tidwell (Tidwell).  Like Dilmore and Young, Hearn and Tidwell are professional appraisers with respectable credentials.  The Hearn report provided the basis for the amended return, while the Tidwell report was prepared approximately 2 years thereafter.

a.  Hearn's Appraisal

Hearn provided its valuation report of parcels A and B to Dudley on September 28, 1988.  Hearn conducted an individual comparable sales analysis with respect to both parcels of trust property.  Both individual analyses involved the use of five comparable sales.  Neither analysis involved the use of a comparable sale used in the other analysis.  Hearn concluded that the highest and best use of parcel A at the time of decedent's death was residential in nature.  Each comparable sale Hearn used

with respect to parcel A had a residential zoning classification. With respect to parcel B, Hearn concluded that its highest and best use was commercial in nature.  The properties used by Hearn with respect to parcel B had office and commercial zoning classifications.  All 10 comparable property sales used by Hearn involved the sale of real estate located in the general vicinity of the trust property.  Hearn's conclusions as to the values of parcels A and B were made subject to each parcel's obtaining access to a sanitary sewer system.  Hearn's conclusion with respect to parcel B was further contingent on that parcel's being accessible to development and able to support improvements. Hearn's appraisal involved making numerous adjustments to the comparable property sales.  Adjustments were made for date of sale, location, market, utilities, and size.  The results of Hearn's analysis can be summarized as follows:

| Parcel | FMV per Acre | FMV of Parcel | FMV of Decedent's 50% Interest |
|--------|--------------|---------------|--------------------------------|
| A | $20,000 | $1,300,000 | $650,000 |
| B | 75,000 | 750,000 | 375,500 |

These results were used in the completion of the amended return.

   b.   Tidwell's Appraisal

   In October 1990, 2 years after the amended return was filed by Holman and Spraggins, Tidwell responded to an earlier request by Dudley to conduct an appraisal of parcels A and B.  Tidwell presented an extensive analysis of both parcels.  Consistent with standard appraisal techniques, Tidwell conducted a highest and

best use analysis of both parcels A and B.  In his judgment, Tidwell concluded that the highest and best use of parcel A at the time of decedent's death was residential in nature.  In reaching his conclusion, Tidwell focused on the topography of parcel A.  His report explains that the rough topography throughout parcel A would require extensive site preparation and that such preparation would likely be hindered by the presence of the developed Bell property.  In his report, Tidwell admits that commercial use would be desirable for parcel A, but he explains that its topography made such use infeasible.  Tidwell also explains in his report that parcel A's limited access to Highway 280 and its existing residential zoning classification led him to conclude that parcel A's highest and best use was residential in nature.

Tidwell concluded that the highest and best use of parcel B, at the time of decedent's death, was commercial in nature.  In support of this conclusion, Tidwell's report explains that the frontage of parcel B along Highway 280 helps to make it suitable for engaging in a commercial undertaking.  Tidwell's report continues by noting that parcel B is not well suited for residential use because of its exposure to traffic noise.

Tidwell performed a comparable sales analysis with respect to both parcels A and B.  With respect to parcel A, Tidwell used four comparable sales of real estate properties located in the general vicinity of parcel A.  Each comparable property used had

a residential zoning classification.  Adjustments were made in order to account for the date of sale, location, size, and utility.  The adjustment for utility accounted for numerous factors, including topography, shape, availability of utilities, and site development estimates.

Tidwell's comparable sales analysis for parcel B also involved four real estate sales of properties located in the general vicinity of the subject property.  All four properties had a commercial zoning classification and similar adjustments were made to account for the variables noted above with respect to parcel A.

The results of Tidwell's appraisal can be summarized as follows:

| Parcel | FMV per Acre | FMV of Parcel | FMV of Decedent's 50% Interest |
|--------|--------------|---------------|-------------------------------|
| A | $19,000 | $1,235,000 | $617,500 |
| B | 95,000 | 975,000 | 487,500 |

7.   School Engineering Study

On September 18, 1992, the Walter Schoel Engineering Co., Inc. (Schoel), provided Holman's attorney with a brief report (Schoel report) regarding parcel A.  The Schoel report was in response to a request that Schoel evaluate the physical characteristics of parcel A.  The objective of the Schoel report was to identify the development potential of the parcel.

Schoel is an organization consisting of numerous engineers, land surveyors, and hydrologists.  As part of its business,

Schoel advises interested parties of the feasibility of development plans for specified real estate. It conducts evaluations of subject properties and identifies restraints and obstacles associated with such properties in light of existing development plans. The evaluation process involves the consideration of numerous criteria, including zoning classification, utility availability, accessibility, topography, soil conditions, and development costs.

The Schoel report states that the general location of parcel A is favorable, but the parcel suffers due to its limited accessibility. The report all but dismisses the value of the approximately 300 feet of frontage parcel A has to Highway 280 and concludes that access to parcel A would likely be limited to that which could be achieved from Cahaba River Road. The Schoel report characterizes the topography and soil conditions of parcel A as "extreme" and likely to result in significant development costs.

The findings of the Schoel report indicate, however, that parcel A was benefited by the availability of utilities, including gas, electricity, and water. The sole exception involved sewer access, and the report indicates that further study would be necessary in order to obtain a more definite opinion in that regard. The Schoel report also states that a serious drainage condition exists on parcel A as a result of runoff from the Bell property. According to the report, this

condition has the potential of inflicting a severe financial burden on plans to develop the parcel.

The Schoel report also briefly addresses the shape of parcel A and its zoning classification. With regard to its shape, the report describes parcel A as essentially two distinct parcels because of the location of the Bell property. As to the zoning of parcel A, the Schoel report generally concludes that a change in the zoning classification of that portion of parcel A without the corporate limits of the city of Birmingham from residential to commercial would be difficult.

## OPINION

Both parties introduced appraisal reports compiled by qualified appraisers, each of whom was familiar with property values in the vicinity of Birmingham, Alabama. Such expert opinion evidence is admissible if it will assist the trier of fact to understand evidence that will determine the fact in issue. See Fed. R. Evid. 702. We must weigh expert opinion evidence in light of the demonstrated qualifications of the expert and all other credible evidence. Johnson v. Commissioner, 85 T.C. 469, 477 (1985). However, we are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). While we may choose to accept the opinion of one expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may also be selective

in the use of any portion of such an opinion, Parker v. Commissioner, 86 T.C. 547, 562 (1986).

1.  Appraisal Reports

All four expert appraisers used the comparable sales method in arriving at values for the property.  The comparable sales method functions by (1) locating properties as physically similar as possible to the subject property which (2) have been sold on the open market in noncollusive, nonforced sales for cash or cash equivalent, within (3) a reasonable time of the date for which a value of the subject property is desired.  Once these properties are located, those features of the subject property that are most pertinent to its value are compared to those same features on the comparable properties.  Since no two sales and no two properties can be identical, the value of those features of the comparable properties which are relevant to the value of the subject property are adjusted until they are of a quality equivalent to those of the subject property.  This Court has found the comparable sales valuation method to be a reasonable one and has used it in the past.  See Frazee v. Commissioner, 98 T.C. 554 (1992); Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979).

The parties have gone to great lengths in their attempts to discredit the validity and usefulness of the appraisal reports relied upon by their opponents.  Petitioner, in particular, adamantly maintains that the Dilmore report is devoid of utility

because of its brevity.  We disagree.  The brevity of the Dilmore report was intentional.  The report was prepared in response to a request by an attorney representing Rivers in the estate proceedings.  The purpose underlying the request was simply to aid Rivers in the performance of her obligations as special administratrix ad colligendum.  Dilmore testified that, in his professional opinion, the report was appropriate for its intended purpose and consistent with guidelines established by the American Institute of Real Estate Appraisers (AIREA).  Dilmore further testified that he would not have agreed to prepare a letter report had he known that the report was to be used in a trial.  Instead, Dilmore further testified, he would have prepared a formal report or none at all.

Although their conclusions differ considerably, there is little contrast in the substance of the reports advanced by either party.  The lengthier reports contain collateral information that, while perhaps helpful and informative to clients, is of little value to a fact finder.  We do not think that the presence or absence of this collateral information should be considered as either benefiting or hindering respondent's reliance upon such documents in reaching her determinations.  We therefore accept the Dilmore report, as we accept each of the remaining three, cognizant of its original purpose.

We decline to address in any significant detail any of the further attempts by either party to discredit the appraisal reports presented by the party's opponent.  We recognize and accept that Tidwell, Hearn, Young, and Dilmore are each experts in their profession of real estate appraising, but we further recognize that reasonable experts specializing in the same profession often disagree.  It is to such disagreement that we attribute any differences in substance, style, and quality among the appraisal reports presented by each party.

## 2.   Property Valuation

Property includable in a decedent's gross estate is generally reported at its fair market value on the date of the decedent's death.  Sec. 2031(a);[1] sec. 20.2031-1(b), Estate Tax Regs.  Fair market value is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Frazee v. Commissioner, supra at 562; sec. 20.2031-1(b), Estate Tax Regs.  The determination of value is to be made as of the valuation date, and knowledge of unforeseeable future events that may have

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

affected the value cannot be considered. Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987); sec. 20.2031-1(b), Estate Tax Regs.

As we noted in Estate of Spruill v. Commissioner, 88 T.C. 1197, 1228 (1987), valuation is not an exact science; rather, the issue is factually based and requires a consideration of the particular facts of each case. Respondent's determinations of value, however, are benefited by a presumption of correctness, and petitioner is burdened with the task of refuting such presumption. Rule 142(a).

We have compared the substance and reasoning of each appraisal report, as well as the testimony presented at trial by the appraisers, and, although we find respondent's argument generally superior, we find that petitioner has successfully established that respondent's determinations with respect to both parcels of trust property are deserving of adjustment.

It is a fundamental principle of valuation that the fair market value of property must reflect its highest and best use. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986). Accordingly, our discussion proceeds with an analysis of the highest and best use of each parcel at issue.

3.   Highest and Best Use

Property should be valued to reflect the highest and best use of the property on the date of the valuation. Frazee v. Commissioner, supra; Stanley Works & Subs. v. Commissioner, supra

at 400. In determining the highest and best use, and in turn the fair market value of property, the realistic, objective potential uses control the valuation process. Stanley Works & Subs. v. Commissioner, supra at 400. The highest and best use of property is the reasonable and probable use that supports the highest present value. Symington v. Commissioner, 87 T.C. 892, 897 (1986). To determine what uses are reasonable and probable, we focus on the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". Olson v. United States, 292 U.S. 246, 255 (1934). The fair market value of property is not governed by whether the owner has actually put the property to its highest and best use, nor whether he or she ever intends to do so. Stanley Works & Subs. v. Commissioner, supra at 400.

Each expert, Dilmore, Young, Tidwell, and Hearn, being certified by the AIREA, recognizes and accepts AIREA's definition of highest and best use. That definition is as follows:

> The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability. [American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal (2d ed. 1989).]

While the guidelines of the AIREA may control the profession to which these witnesses belong, that entity's guidelines are not

binding on this Court.  We recognize, however, that the definition of highest and best use set forth immediately above is consistent with the principles of <u>Frazee v. Commissioner</u>, 98 T.C. 554 (1992); <u>Symington v. Commissioner</u>, <u>supra</u>; and <u>Stanley Works & Subs. v. Commissioner</u>, <u>supra</u>.

a.   <u>Parcel A</u>

Young and Dilmore both concluded that the highest and best use of parcel A on the date of decedent's death was commercial in nature.  Tidwell and Hearn, on the other hand, disagreed and concluded that, as of the date of decedent's death, the highest and best use of parcel A was residential in nature.  The classification as either commercial or residential is significant because such classification is directly related to the appraisal value of the property.  More specifically, with other factors remaining constant, the value of commercial real estate generally exceeds the value of residential real estate.  Respondent's determinations rely upon the Young and Dilmore conclusions, while petitioner's argument is based upon the Tidwell and Hearn conclusions.

Much of the present dispute involves the zoning classification of parcel A as of the valuation date.  As of the date of decedent's death, February 20, 1987, roughly half of parcel A was within the city limits of the city of Birmingham, Alabama.  The remaining portion of parcel A was located outside the corporate limits of the city and in Jefferson County,

Alabama. Despite this division, however, the entire parcel had an R-1 (residential) zoning classification.

The reports prepared by Young and Dilmore are based upon the belief of each that it was reasonable to expect that the zoning classification of the parcel could be changed from residential to commercial with relatively little difficulty. The Tidwell and Hearn reports, on the other hand, are premised on their opinions that such a change in the zoning classification of parcel A would have been difficult and unlikely.

Respondent maintains as a threshold matter that the location of parcel A speaks for itself. That is, respondent contends that the proximity of parcel A to the intersection of I-459 and Highway 280 is sufficient to establish that highest and best use of the parcel could not be residential. We do not think that location alone can be held to be determinative. Rather, we think that location is merely a factor among the many factors to be considered.

Respondent also argues that at the time Young and Dilmore were appraising the trust property, the area in the vicinity of such property was undergoing an obvious trend toward commercial development. Respondent maintains that this trend supports the conclusions reached by Young and Dilmore regarding the likelihood of a rezoning. There appears to be much validity to this assertion. The record contains testimony involving the area in the vicinity of the intersection of Highway 280 and I-459. The

record also contains a significant amount of evidence involving the area south of the intersection of Highway 280 and I-459. This corridor has indeed undergone significant commercial development over the years. Most notably, in this regard, was the development of the Bell property, which is contiguous to parcel A, and the large Colonnade complex located immediately across I-459 from parcel A. Respondent recognizes that the vast majority of this commercial development has occurred south of I-459, but she points out that there are pockets of commercially developed land to the north of the I-459 intersection with Highway 280 as well. It is respondent's contention that the commercial development, so obviously apparent south of I-459, was continuing its northerly progression and that it was upon such conspicuous progression that Young and Hearn based their conclusions. In support of this assertion, respondent points to changes in the zoning classification of numerous parcels of real estate located north of the intersection of I-459 and Highway 280 that have occurred since decedent's death. Respondent places particular emphasis on several of these changes which occurred within a year of decedent's death.

Respondent also cites the findings of Smyer and Scotch as support for her conclusion that Young and Dilmore correctly concluded that the highest and best use of parcel A was commercial in nature. Smyer and Scotch, two unaffiliated appraisers, were hired by Held and Dudley in 1979 to value the

land condemned by the State of Alabama for the purpose of constructing I-459. Smyer concluded that the highest and best use of the property condemned for such purpose was commercial. Scotch's extremely brief report did not address the concept of highest and best use; however, it involved an analysis of comparable real estate sales in which he used only commercial property sales. Respondent contends that petitioner is applying the concept of highest and best use selectively so as to maximize the benefits of its application.

Petitioner disagrees with respondent and contends that Hearn and Tidwell were correct in concluding that, as of the valuation date, it would have been difficult, if not unlikely, to have the residential zoning classification of parcel A changed to a commercial classification. Petitioner advances several arguments in support of its contention that a change in the zoning of parcel A was unlikely. On brief, petitioner explains that parcel A is in the middle of a residential community. Petitioner contends that Hearn's and Tidwell's conclusions that a commercial rezoning was unlikely were supported by the contractual agreement between the Jefferson County zoning commission (zoning commission) and Bell, prohibiting Bell from constructing a road connecting its property to Cahaba River Road. Petitioner maintains that this agreement reflected the desire of the zoning commission to insulate the residential property west of Cahaba River Road from what was referred to as "creeping commercialism".

Petitioner further argues in favor of the conclusions by Hearn and Tidwell that a commercial rezoning was unlikely by pointing to a zoning dispute involving a nearby church. The dispute arose when officials from the church proposed to construct a church in an area with an existing residential zoning classification. The county zoning commission denied the requested change, citing an unacceptable increase in traffic within the residential area surrounding the proposed location as the basis for its denial. The church officials ultimately prevailed, however, when a State court reversed the zoning commission and ordered a rezoning. Petitioner argues that this dispute clearly indicated that the zoning commission was generally inclined to deny rezoning requests involving land in the vicinity of parcel A. Accordingly, petitioner contends, Hearn and Tidwell were both justified in reaching their conclusions with regard to the zoning of parcel A.

Petitioner further argues in support of the conclusions advanced by Hearn and Tidwell by pointing to what it refers to as a 200-foot buffer zone extending the length of parcel A along Cahaba River Road, which was created when the city of Birmingham partially annexed parcel A in 1985. Petitioner contends that the existence of this buffer zone, which remained under the control of the county zoning commission, in effect, served to make any likely commercial rezoning of the portion of parcel A within the corporate limits of the city of Birmingham irrelevant because the

county zoning commission would deny commercial access from Cahaba River Road through the zone. The effect, petitioner suggests, is indistinguishable from the contractual agreement between the county zoning commission and Bell preventing Bell from constructing a road connecting its property to Cahaba River Road.

The mere fact that the current zoning restrictions of a parcel of real estate do not permit a particular use does not necessarily preclude a consideration of the unpermitted use when conducting a highest and best use analysis. Frazee v. Commissioner, 98 T.C. at 564. When there is a reasonable probability that the zoning regulations will change within the near future, such change can be considered in the determination of value. Id. (citing Investors Funding Corp. v. Bloor, 592 F.2d 134, 136 (2d Cir. 1979); Estate of Pattison v. Commissioner, T.C. Memo. 1990-428). For example, in Estate of Wolfe v. Commissioner, a Memorandum Opinion of this Court dated Jan. 15, 1954, the status of a rezoning was on appeal on the date of valuation. We noted that, while the property could not properly be valued as though the rezoning had already been completed, the fact that a change in zoning was in prospect was an element deserving of consideration in the process of determining value. Id.

We have little doubt that there existed at the time of decedent's death a reasonable probability that parcel A could be rezoned from residential to commercial. In fact, considering the

facts and circumstances involved in this case, we think that such rezoning was quite likely. The facts generally illustrate that the Highway 280 corridor in the vicinity of I-459 was undergoing a northerly progression of commercial development. Not only was this progression occurring at the time of decedent's death, but it had been occurring for many years prior to his death. This is clearly evident from a series of events and transactions dating back to at least 1979. A reading of the Smyer and Scotch appraisal reports, both of which are dated March 29, 1979, suggests as much. In particular, in support for concluding that the highest and best use of the property condemned for the purposes of constructing I-459 was commercial, Smyer explains in his report that the corridor south of the condemned property has shown "phenomenal development" with "substantial improvements being constructed" prior to the condemnation.

Petitioner concedes the existence of this growth and development but maintains that the progression ceased with the construction of I-459. However, the development of the Bell property in the early 1980's is an indication to the contrary. With the development of the Bell property came the presence of a large commercial operation north of I-459 on real estate once zoned residential.

Petitioner, however, considers the presence of the Bell property to be an exception to its underlying argument that the progression of commercial development stopped at I-459 and points

to the contractual restriction prohibiting Bell from accessing its property from Cahaba River Road as evidence. Petitioner maintains that such a restriction indicates the zoning commission's desire to insulate the area west of Cahaba River Road from commercial growth and development. This may very well be the case, but the existence of the restriction also suggests that the zoning commission is willing to negotiate the issue of rezoning. As a result, we decline to construe the restriction, which is obviously the product of good-faith negotiation, as strictly as petitioner suggests.

Another indication of the trend toward commercializing the area north of I-459 is that several investors and developers were interested in parcels A and B. Although none of the offers or options to purchase evolved into a sale, none of them were made or acquired with the expectation of developing the underlying property for residential purposes. Rather, the investors and developers expressing interest in such properties all did so with plans to develop commercially. The offer by Runnion in 1980 was made with an office development project in mind. The offer made by Institutional Investment Corp. for the purchase of parcel B was made with the objective of constructing "commercial buildings". The agreement between Lincoln and the trustees to enter into a partnership arrangement also involved plans to develop property north of I-459 commercially.

Perhaps the most conspicuous indication that the commercialization of the Highway 280 corridor was continuing north of I-459, and that a reasonable probability existed that parcel A could be rezoned, was the annexation of roughly one-half of parcel A and all of parcel B by the city of Birmingham in 1985. The purpose of this annexation was to expand the city's tax base by increasing the number of commercial properties within its corporate limits. It seems to us that the natural consequence of this unilateral expansion was an inevitable rezoning. As to why the city of Birmingham did not rezone the annexed properties concurrently with the annexation remains unclear. But the fact that the annexation occurred with such rezoning in mind is evident.

Petitioner attempts to detract from this seemingly unambiguous indication of the commercial progression north of I-459 by pointing to the so-called buffer zone separating that portion of parcel A annexed by the city of Birmingham from Cahaba River Road. Petitioner contends that the existence of the buffer zone effectively operates in a manner much the same as the restriction Bell contractually agreed to with regard to gaining access to Cahaba River Road. To the extent that petitioner's contention may be accurate, we need only refer to our discussion above pertaining to the Bell restriction. However, we think the existence of this so-called buffer zone is markedly different from the restriction placed on the Bell property. There is no

evidence in the record suggesting that county zoning commission officials, or any other county officials for that matter, had any involvement regarding the creation of this buffer zone. Moreover, the record lacks conclusive evidence concerning the reason the annexation stopped where it did. Petitioner's speculation with regard to the purpose and effect of the buffer zone may indeed be plausible, but it is speculation nonetheless.

In recognition of this series of events, we conclude that at the time of decedent's death there existed numerous indications that the Highway 280 corridor was experiencing a northerly progression of commercial development and that such progression was extending beyond I-459. We further conclude that parcel A was within the parameters of this expansion as of the valuation date. Accordingly, we conclude that there was a reasonable probability that parcel A could likely be rezoned to a commercial classification within a relatively short period of time following decedent's death. See Frazee v. Commissioner, 98 T.C. at 564.

To a lesser extent, the current dispute involves the accessibility of parcel A. Respondent recognizes that parcel A suffers from an accessibility standpoint. Respondent maintains, however, that the extent of the accessibility problem is not significant enough to warrant a finding that its highest and best use is not commercial in nature. Petitioner disagrees and contends that parcel A was so inaccessible as to preclude commercial development. Accordingly, petitioner contends that

Tidwell and Hearn correctly concluded that the highest and best use of Parcel A was residential in nature.

There is little question that parcel A has only limited access to Highway 280. We do not think, however, that this is sufficient, as petitioner generally suggests, to conclude that the highest and best use of parcel A is not commercial. Although the 300 feet of Highway 280 frontage parcel A does have would likely require substantial modification to facilitate accessibility, the accompanying costs could be accounted for in the valuation process. Even if, as one of petitioner's witnesses claimed, regulations promulgated by the State highway commission may prevent or restrict such access due to the proximity of this frontage to the entrance of the Bell property, Cahaba River Road provides a means of alternative access to parcel A. In fact, such latter access might be preferable for commercial development. In any event, the extent to which parcel A is less attractive from a commercial development perspective, due to the lack of convenient access to Highway 280, can be sufficiently accounted for in the process of value estimation and should not be construed as denuding the parcel of commercial utility.

We are unwilling to accept petitioner's contention that the so-called buffer zone separating Cahaba River Road from that portion of parcel A annexed by the city of Birmingham in 1985 imposed an absolute barrier to the accessibility of parcel A from Cahaba River Road. At best, the record establishes only that a

prospective commercial developer would experience friction in attempting a rezoning. Accordingly, the asserted difficulties in gaining access to parcel A do not persuade us that the highest and best use of the parcel is other than commercial in nature.

Other factors involved in this dispute with respect to parcel A include its size, shape, available utilities, and topography. Perhaps the most significant of these factors involves the topography of parcel A. This Court, accompanied by counsel for both parties, conducted a viewing of parcel A. Petitioner contends that the steep slopes and extensive rock throughout the parcel effectively preclude development of the parcel commercially for profit. Respondent, on the other hand, recognizes that the slopes and rock impose barriers to commercial development, but contends that such barriers do not make commercial development physically impossible. Considering our viewing of the property, we are inclined to agree with respondent. We recognize that the terrain of parcel A may, in fact, prevent various types of commercial development projects, but we are not persuaded by petitioner's argument that parcel A cannot be developed commercially for profit under any circumstance. Instead, we think the development costs elaborated upon by many of petitioner's experts can and should be accounted for during the valuation process.

Petitioner also cites the irregular shape and size of parcel A as contributing to its conclusion that its highest and best use

cannot be commercial in nature. Petitioner does not, however, advance a meaningful argument with respect to these two factors. Parcel A is indeed an awkwardly positioned large piece of real estate. However, we fail to see how these factors lend material support to the conclusion reached by petitioner.

Much of the testimony offered by petitioner through its witnesses involves the availability of utilities on parcel A. In particular, petitioner maintains that the establishment of sewer facilities to parcel A would likely be cost prohibitive. Considering the testimony by the several witnesses called by petitioner, we can appreciate that parcel A suffers in this regard, but this should not be considered unusual. At issue is the development of a piece of undeveloped real estate, and it would seem that such development commonly occurs on real estate lacking direct sewer facilities. It seems odd that petitioner maintains that the lack of immediate sewer connections on parcel A presents an insurmountable hurdle with respect to commercial development while simultaneously contending that such an obstacle does not equally impair residential development. In any event, the extent to which parcel A is burdened by the lack of immediate sewer connections can be accounted for in valuing the parcel.

Petitioner has expended an enormous effort in its attempt to convince this Court that Hearn and Tidwell were both correct in concluding that the highest and best use of parcel A was residential rather than commercial as of the date of decedent's

death.  Petitioner contends that respondent is transfixed on the concept of location and that she has failed to factor into her analysis the many characteristics of parcel A which detract from its utility.  Petitioner's argument suffers from at least one significant flaw.  Just as respondent has placed considerable reliance on the location of parcel A, contending that such location evinces its commercial qualities, petitioner has relied to an equal extent in arguing that parcel A is located in a residential area.  We do not regard either argument as determinative.

We are convinced that the highest and best use of parcel A as of the date of decedent's death was commercial in nature; such use was reasonable and probable.  See Symington v. Commissioner, 87 T.C. at 897.  Considering the entire record, with particular emphasis on the appraisal reports prepared by Tidwell, Hearn, Young and Dilmore, we find that the conclusions reached by both Dilmore and Young relating to the highest and best use of parcel A were realistic and objective under the circumstances of this case.  See Stanley Works & Subs. v. Commissioner, 87 T.C. at 400.

b.   Parcel B

The parties are in agreement that the highest and best use of parcel B, as of the valuation date, was commercial in nature. Each of the four appraisers, Tidwell, Hearn, Young, and Dilmore, concluded that a rezoning of parcel B from residential to

commercial was reasonable and likely. See Symington v. Commissioner, supra. These appraisers, however, are not in agreement with respect to the way factors such as topography, size, shape, accessibility, visibility, and available utilities influence the commercial utility of parcel B. Respondent maintains that these factors do not impair the use of parcel B in any significant manner. Petitioner disagrees and contends that such factors impose substantial limitations on plans to develop the parcel commercially for profit.

Perhaps the most significant point of dispute involves the topography of parcel B. Parcel B consists of approximately 10 acres of land. Prior to the construction of I-459, parcel B contained a large depression, roughly 4 acres in size. As part of the plan to dispose of excess earth and rock accumulated during the I-459 construction project, Held agreed to accept as much of this excess accumulation as needed to bring the 4-acre depression to grade level.

Petitioner maintains that the 4 acres of filled area on parcel B constitute the only portion of that parcel suitable for any type of commercial development. Petitioner contends that the remaining 6 acres consist of excessively steep sloping terrain with a substantial amount of exposed surface rock. Petitioner further contends that significant evidence exists which brings the integrity of the fill into question. Pointing to an engineering report prepared in 1985 that presents an analysis of

the quality and characteristics of the fill, petitioner contends that the variety of potential commercial development is limited considerably in light of the poor quality and inferior characteristics of the fill.

Respondent disagrees with petitioner's contention that only 4 acres of the filled area on parcel B are sufficiently flat to permit development. Respondent contends that an additional 2 acres are relatively flat and would support a variety of commercial development projects. Respondent also dismisses the findings of the engineering study with regard to the quality of the fill. Respondent contends that the restrictions and requirements necessary to build a foundation in the area of the fill would be of little difference from the restrictions and requirements otherwise necessary to construct foundations throughout the region.

This Court, accompanied by counsel for both parties, viewed parcel B. We agree with respondent that roughly 6 acres are sufficiently flat. We recognize that the engineering study expressed genuine concerns as to the quality of the fill, but we further recognize that the testimony at trial with regard to the extent such quality might impair potential development was less than conclusive. A legitimate concern was raised with regard to the depth and frequency of soil samples used in the analysis. Therefore, the engineering study must be viewed accordingly.

The parties agree that parcel B lacks access to I-459 and has access to Highway 280.  Petitioner contends, however, that the limited amount of access to parcel B significantly burdens the property.  Petitioner further argues that any benefit parcel B experienced due to its access to Highway 280 at the time of decedent's death must be discounted to account for pending plans by the State of Alabama to modify Highway 280.  Such modification, petitioner contends, might eliminate access to Highway 280 altogether.

Respondent replies to petitioner's concern regarding future modification plans of Highway 280 by pointing to St. Clair County v. Bukacek, 131 So. 2d 683 (Ala. 1961).  Respondent explains that St. Clair County would require the State of Alabama to compensate the owner of parcel B if such modification resulted in denying that owner access to Highway 280.

We agree with respondent.  At the time of decedent's death, parcel B had the benefit of direct access to Highway 280. Problems similar to those cited as besetting the accessibility of parcel A did not impair the accessibility of parcel B.  Although the record is not entirely clear as to the approximate amount of Highway 280 frontage that existed on parcel B, it contains sufficient evidence to conclude that ample usable frontage did, in fact, exist.  We recognize that pending plans to modify the existing highway raise legitimate concerns from a valuation standpoint, but we are unconvinced that petitioner properly

accounted for such concerns.  There is nothing in the record that suggests that plans to modify Highway 280 were anything more than mere speculation.  We agree with respondent that the St. Clair County case explains how any ill effects experienced by an owner of parcel B are to be dealt with if some future modification prevents that owner from accessing Highway 280 from parcel B.

Petitioner also maintains that parcel B suffers from a lack of visibility from I-459.  This lack of visibility, petitioner contends, is caused by a hill, which petitioner refers to as a large ridge or mountain, that separates parcel B from I-459.  We cannot grant much weight to petitioner's argument in this regard because even its own witnesses, Hearn and Tidwell, disagree as to the extent visibility is an issue.

Both parties also consider the size, shape, and available utilities of parcel B, but their arguments in that regard are essentially limited to a discussion concerning the lack of immediate sewer connections.  Again, the parties disagree extensively as to the effect on valuation caused by the lack of immediate sewer connections to parcel B.  Petitioner contends that establishing sewer connections to parcel B would be cost prohibitive because doing so would require either boring or tunneling under Highway 280 or connecting to a sewer line located roughly 1 mile to the north of parcel B.  Respondent agrees with petitioner as to where sewer connections might be made; however, she contends that such connections would not be cost prohibitive.

The record is anything but conclusive with regard to the effect that a lack of immediate sewer connections has on the value of parcel B.  The testimony of several witnesses supports petitioner's argument, but evidence also exists in support of the contention advanced by respondent.

We agree with both parties that the highest and best use of parcel B was commercial in nature at the time of decedent's death.  Such use was both realistic and objective under the circumstances.  See Stanley Works & Subs. v. Commissioner, 87 T.C. at 400.  Additionally, we are generally inclined to agree with respondent with regard to the extent that the several characteristics discussed above influence the commercial utility of parcel B.  While we recognize that petitioner's argument on that score has some merit, much of petitioner's concern is exaggerated.

4.  Evidentiary Value of the Offers and Options

On brief, petitioner advances a rather lengthy argument with respect to how this Court should view respondent's introduction into evidence of several offers to buy and option contracts to purchase portions of the trust property.  We find this argument to be without merit.  It is clear that as a general rule, unaccepted offers have no more than limited probative weight in estimating value.  Sharp  v. United States, 191 U.S. 341 (1903); Jayson v. United States, 294 F.2d 808 (5th Cir. 1961).  Indeed, this general rule has been held applicable to both offers and

options.  See, e.g., <u>United States v. Certain Land in the City of Fort Worth</u>, 414 F.2d 1029 (5th Cir. 1969); <u>United States v. Smith</u>, 355 F.2d 807 (5th Cir. 1966); <u>United States v. Playa De Flor Land & Improvement Co.</u>, 160 F.2d 131 (5th Cir. 1947); <u>St. Joe Paper Co. v. United States</u>, 155 F.2d 93 (5th Cir 1946).  The Supreme Court in <u>Sharp</u> questioned the integrity of such evidence and stated that for a variety of reasons it often fails to provide a reliable reference for estimating the value of property.  <u>Sharp v. United States</u>, <u>supra</u> at 348.  However, the rule in <u>Sharp</u> was designed to serve specific purposes and was not meant to be enforced mechanically or without regard to the reasons for its existence.  <u>University Computing Co. v. Lykes-Youngstown Corp.</u>, 504 F.2d 518 (5th Cir. 1974).  In any event, we need not consider its application to the instant case as petitioner correctly asserts that there is no evidence in the record suggesting that any of the four appraisers, Tidwell, Hearn, Young, and Dilmore, considered the offers or options to purchase in their estimation of the fair market value of either parcel.  Although respondent advanced considerable argument with regard to how this Court should interpret the contents of the offers and options, we do not think it is necessary for us to rely upon such evidence in deciding the issues at hand.  The testimony at trial, coupled with the four appraisal reports, provides ample evidence to support our decision without consideration of the offers and options to purchase.

5. __Conclusion__

We have concluded that the appraisal reports presented by respondent correctly identify that the highest and best use of both parcels was commercial in nature at the time of decedent's death. However, petitioner has raised many concerns with respect to each parcel. Having viewed both parcels, and in light of the testimony contained in the voluminous record, we believe that some of these concerns are credible. Accordingly, we feel it necessary to adjust the fair market value of each parcel as determined by respondent. With respect to parcel A, our adjustment stems primarily from the topography of the terrain and the parcel's limited accessibility to and from Highway 280. With respect to parcel B, our adjustment stems principally from the parcel's lack of proximity to sewer facilities and the questionable integrity of the fill.

Taking into account the foregoing, we hold that on February 20, 1987, the fair market value of parcel A was $5 million. Similarly, we hold that the fair market value of parcel B was $1.5 million on February 20, 1987. Consequently, the fair market value of decedent's one-half interest on February 20, 1987, was $2.5 million in parcel A and $750,000 in parcel B.

To reflect the foregoing,

                                                __Decision will be entered__

                                                __under Rule 155.__